## WIDMAR ET AL. *v.* VINCENT ET AL.

No. 80–689.   Argued October 6, 1981—Decided December 8, 1981

264

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 277. WHITE, J., filed a dissenting opinion, *post*, p. 282.

*Ted D. Ayres* argued the cause for petitioners. With him on the brief was *Jackson A. Wright.*

*James M. Smart, Jr.,* argued the cause for respondents. With him on the brief was *Michael K. Whitehead.**

JUSTICE POWELL delivered the opinion of the court.

This case presents the question whether a state university, which makes its facilities generally available for the activities

---

*Briefs of *amici curiae* urging reversal were filed by *Jerold Blumoff* and *Marc D. Stern* for the American Jewish Congress; and by *Justin J. Finger, Jeffrey P. Sinensky,* and *Meyer Eisenberg* for the Anti-Defamation League of B'nai B'rith.

Briefs of *amici curiae* urging affirmance were filed by *Joel H. Paget* for the Association for the Coordination of University Religious Affairs; by *Wilkes C. Robinson* and *Jane E. Nelson* for Bible Study; by *Edward McGlynn Gaffney, Jr.,* and *Kenneth F. Ripple* for the Center for Constitutional Studies et al.; by *Barry A. Fisher* for the Holy Spirit Association for the Unification of World Christianity; by *Nathan Lewin, Daniel D. Chazin,* and *Dennis Rapps* for the National Jewish Commission on Law and Public Affairs; and by *Wilfred R. Caron* for the United States Catholic Conference.

Briefs of *amici curiae* were filed by *Earl W. Trent, Jr.,* for the Baptist Joint Committee on Public Affairs; by *J. Robert Brame, John W. Whitehead,* and *James J. Knicely* for the National Association of Evangelicals; and by *Donald L. Reidhaar* for the Regents of the University of California.

of registered student groups, may close its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion.

## I

It is the stated policy of the University of Missouri at Kansas City[1] to encourage the activities of student organizations. The University officially recognizes over 100 student groups. It routinely provides University facilities for the meetings of registered organizations. Students pay an activity fee of $41 per semester (1978–1979) to help defray the costs to the University.

From 1973 until 1977 a registered religious group named Cornerstone regularly sought and received permission to conduct its meetings in University facilities.[2] In 1977, however, the University informed the group that it could no longer meet in University buildings. The exclusion was based on a regulation, adopted by the Board of Curators in 1972, that prohibits the use of University buildings or grounds "for purposes of religious worship or religious teaching."[3]

---

[1] The University of Missouri at Kansas City (UMKC) is one of four campuses of the University of Missouri, an institution of the State of Missouri.

[2] Cornerstone is an organization of evangelical Christian students from various denominational backgrounds. According to an affidavit filed in 1977, "perhaps twenty students . . . participate actively in Cornerstone and form the backbone of the campus organization." Affidavit of Florian Chess (Sept. 29, 1977), quoted in *Chess* v. *Widmar*, 480 F. Supp. 907, 911 (WD Mo. 1979). Cornerstone held its on-campus meetings in classrooms and in the student center. These meetings were open to the public and attracted up to 125 students. A typical Cornerstone meeting included prayer, hymns, Bible commentary, and discussion of religious views and experiences.

[3] The pertinent regulations provide as follows:

"4.0314.0107 No University buildings or grounds (except chapels as herein provided) may be used for purposes of religious worship or religious teaching by either student or nonstudent groups. . . . The general prohibition against use of University buildings and grounds for religious worship

Eleven University students, all members of Cornerstone, brought suit to challenge the regulation in the Federal District Court for the Western District of Missouri.[4] They alleged that the University's discrimination against religious activity and discussion violated their rights to free exercise of religion, equal protection, and freedom of speech under the First and Fourteenth Amendments to the Constitution of the United States.

Upon cross-motions for summary judgment, the District Court upheld the challenged regulation. *Chess* v. *Widmar*, 480 F. Supp. 907 (1979). It found the regulation not only justified, but required, by the Establishment Clause of the Federal Constitution. *Id.,* at 916. Under *Tilton* v. *Richardson*, 403 U. S. 672 (1971), the court reasoned, the State

---

or religious teaching is a policy required, in the opinion of The Board of Curators, by the Constitution and laws of the State and is not open to any other construction. No regulations shall be interpreted to forbid the offering of prayer or other appropriate recognition of religion at public functions held in University facilities. . . .

"4.0314.0108   Regular chapels established on University grounds may be used for religious services but not for regular recurring services of any groups. Special rules and procedures shall be established for each such chapel by the Chancellor. It is specifically directed that no advantage shall be given to any religious group."

There is no chapel on the campus of UMKC. The nearest University chapel is at the Columbia campus, approximately 125 miles east of UMKC.

Although the University had routinely approved Cornerstone meetings before 1977, the District Court found that University officials had never "authorized a student organization to utilize a University facility for a meeting where they had full knowledge that the purposes of the meeting include[d] religious worship or religious teaching." *Chess* v. *Widmar, supra,* at 910.

[4] Respondent Clark Vincent and Florian Chess, a named plaintiff in the action in the District Court, were among the students who initiated the action on October 13, 1977. Named as defendants were the petitioner Gary Widmar, the Dean of Students at UMKC, and the University's Board of Curators.

could not provide facilities for religious use without giving prohibited support to an institution of religion. 480 F. Supp., at 915–916. The District Court rejected the argument that the University could not discriminate against religious speech on the basis of its content. It found religious speech entitled to less protection than other types of expression. *Id.*, at 918.

The Court of Appeals for the Eighth Circuit reversed. *Chess* v. *Widmar*, 635 F. 2d 1310 (1980). Rejecting the analysis of the District Court, it viewed the University regulation as a content-based discrimination against religious speech, for which it could find no compelling justification. *Id.*, at 1315–1320. The court held that the Establishment Clause does not bar a policy of equal access, in which facilities are open to groups and speakers of all kinds. *Id.*, at 1317. According to the Court of Appeals, the "primary effect" of such a policy would not be to advance religion, but rather to further the neutral purpose of developing students' " 'social and cultural awareness as well as [their] intellectual curiosity.' " *Ibid.* (quoting from the University bulletin's description of the student activities program, reprinted in *id.*, at 1312, n. 1).

We granted certiorari. 450 U. S. 909. We now affirm.

## II

Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms.[5] The Constitution

---

[5] This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum. See generally *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Cox* v. *Louisiana,* 379 U. S. 536 (1965). "The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.' " *Healy* v. *James,* 408 U. S. 169, 180 (1972). Moreover, the capacity of a

forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place. See, *e. g.*, *Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 175, and n. 8 (1976) (although a State may conduct business in private session, "[w]here the State has opened a forum for direct citizen involvement," exclusions bear a heavy burden of justification); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555–559 (1975) (because municipal theater was a public forum, city could not exclude a production without satisfying constitutional safeguards applicable to prior restraints).

The University's institutional mission, which it describes as providing a *"secular* education" to its students, Brief for Petitioners 44, does not exempt its actions from constitutional scrutiny. With respect to persons entitled to be there, our cases leave no doubt that the First Amendment

---

group or individual "to participate in the intellectual give and take of campus debate . . . [would be] limited by denial of access to the customary media for communicating with the administration, faculty members, and other students." *Id.*, at 181–182. We therefore have held that students enjoy First Amendment rights of speech and association on the campus, and that the "denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes" must be subjected to the level of scrutiny appropriate to any form of prior restraint. *Id.*, at 181, 184.

At the same time, however, our cases have recognized that First Amendment rights must be analyzed "in light of the special characteristics of the school environment." *Tinker* v. *Des Moines Independent School District*, 393 U. S. 503, 506 (1969). We continue to adhere to that view. A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.

rights of speech and association extend to the campuses of state universities. See, *e. g., Healy* v. *James,* 408 U. S. 169, 180 (1972); *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503, 506 (1969); *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960).

Here UMKC has discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion. These are forms of speech and association protected by the First Amendment. See, *e. g., Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S. 640 (1981); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Saia* v. *New York,* 334 U. S. 558 (1948).[6] In order to justify discrimina-

---

[6] The dissent argues that "religious worship" is not speech generally protected by the "free speech" guarantee of the First Amendment and the "equal protection" guarantee of the Fourteenth Amendment. If "religious worship" were protected "speech," the dissent reasons, "the Religion Clauses would be emptied of any independent meaning in circumstances in which religious practice took the form of speech." *Post,* at 284. This is a novel argument. The dissent does not deny that speech *about* religion is speech entitled to the general protections of the First Amendment. See *post,* at 283–284, and n. 2, 286. It does not argue that descriptions of religious experiences fail to qualify as "speech." Nor does it repudiate last Term's decision in *Heffron* v. *International Society for Krishna Consciousness, Inc.,* which assumed that religious appeals to nonbelievers constituted protected "speech." Rather, the dissent seems to attempt a distinction between the kinds of religious speech explicitly protected by our cases and a new class of religious "speech act[s]," *post,* at 285, constituting "worship." There are at least three difficulties with this distinction.

First, the dissent fails to establish that the distinction has intelligible content. There is no indication when "singing hymns, reading scripture, and teaching biblical principles," *post,* at 283, cease to be "singing, teaching, and reading"—all apparently forms of "speech," despite their religious subject matter—and become unprotected "worship."

Second, even if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer. Cf. *Fowler* v. *Rhode Island,* 345 U. S. 67, 70 (1953). Merely to draw the distinction would require the university—and ultimately the courts—to

tory exclusion from a public forum based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions. It must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. See *Carey* v. *Brown*, 447 U. S. 455, 461, 464–465 (1980).[7]

## III

In this case the University claims a compelling interest in maintaining strict separation of church and State. It derives this interest from the "Establishment Clauses" of both the Federal and Missouri Constitutions.

## A

The University first argues that it cannot offer its facilities to religious groups and speakers on the terms available to

---

inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases. *E. g., Walz* v. *Tax Comm'n,* 397 U. S. 664, 668 (1970).

Finally, the dissent fails to establish the *relevance* of the distinction on which it seeks to rely. The dissent apparently wishes to preserve the vitality of the Establishment Clause. See *post,* at 284–285. But it gives no reason why the Establishment Clause, or any other provision of the Constitution, would require different treatment for religious speech designed to win religious converts, see *Heffron, supra,* than for religious worship by persons already converted. It is far from clear that the State gives greater support in the latter case than in the former.

[7] See also *Healy* v. *James, supra,* at 184:

"It is to be remembered that the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities described above. While a college has a legitimate interest in preventing disruption on the campus, which . . . may justify such restraint, a 'heavy burden' rests on the college to demonstrate the appropriateness of that action."

other groups without violating the Establishment Clause of the Constitution of the United States.[8]  We agree that the interest of the University in complying with its constitutional obligations may be characterized as compelling.  It does not follow, however, that an "equal access" policy would be incompatible with this Court's Establishment Clause cases. Those cases hold that a policy will not offend the Establishment Clause if it can pass a three-pronged test: "First, the [governmental policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the [policy] must not foster 'an excessive government entanglement with religion.'"  *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971).  See *Committee for Public Education* v. *Regan*, 444 U. S. 646, 653 (1980); *Roemer* v. *Maryland Public Works Bd.*, 426 U. S. 736, 748 (1976).

In this case two prongs of the test are clearly met.  Both the District Court and the Court of Appeals held that an open-forum policy, including nondiscrimination against religious speech,[9] would have a secular purpose[10] and would

[8] "Congress shall make no law respecting an establishment of religion . . . ."  U. S. Const., Amdt. 1.  The Establishment Clause has been made applicable to the States through the Fourteenth Amendment.  See *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940).

[9] As the dissent emphasizes, the Establishment Clause requires the State to distinguish between "religious" speech—speech, undertaken or approved by the State, the primary effect of which is to support an establishment of religion—and "nonreligious" speech—speech, undertaken or approved by the State, the primary effect of which is not to support an establishment of religion.  This distinction is required by the plain text of the Constitution.  It is followed in our cases.  *E. g.*, *Stone* v. *Graham*, 449 U. S. 39 (1980).  The dissent attempts to equate this distinction with its view of an alleged constitutional difference between religious "speech" and religious "worship."  See *post*, at 285, and n. 3.  We think that the distinction advanced by the dissent lacks a foundation in either the Constitution or in our cases, and that it is judicially unmanageable.

[10] It is the avowed purpose of UMKC to provide a forum in which students can exchange ideas.  The University argues that use of the forum

avoid entanglement with religion.[11]  But the District Court concluded, and the University argues here, that allowing religious groups to share the limited public forum would have the "primary effect" of advancing religion.[12]

for religious speech would undermine this secular aim.  But by creating a forum the University does not thereby endorse or promote any of the particular ideas aired there.  Undoubtedly many views are advocated in the forum with which the University desires no association.

Because this case involves a forum already made generally available to student groups, it differs from those cases in which this Court has invalidated statutes permitting school facilities to be used for instruction by religious groups, but *not* by others.  See, *e. g.*, *McCollum* v. *Board of Education*, 333 U. S. 203 (1948).  In those cases the school may appear to sponsor the views of the speaker.

[11] We agree with the Court of Appeals that the University would risk greater "entanglement" by attempting to enforce its exclusion of "religious worship" and "religious speech."  See *Chess* v. *Widmar*, 635 F. 2d 1310, 1318 (CA8 1980).  Initially, the University would need to determine which words and activities fall within "religious worship and religious teaching."  This alone could prove "an impossible task in an age where many and various beliefs meet the constitutional definition of religion."  *O'Hair* v. *Andrus*, 198 U. S. App. D. C. 198, 203, 613 F. 2d 931, 936 (1979) (footnote omitted); see L. Tribe, American Constitutional Law § 14–6 (1978).  There would also be a continuing need to monitor group meetings to ensure compliance with the rule.

[12] In finding that an "equal access" policy would have the primary effect of advancing religion, the District Court in this case relied primarily on *Tilton* v. *Richardson*, 403 U. S. 672 (1971).  In *Tilton* this Court upheld the grant of federal financial assistance to sectarian colleges for secular purposes, but circumscribed the terms of the grant to ensure its constitutionality.  Although Congress had provided that federally subsidized buildings could not be used for sectarian or religious worship for 20 years, the Court considered this restriction insufficient: "If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the [constitutionally impermissible] effect of advancing religion."  *Id.*, at 683.  From this statement the District Court derived the proposition that state funds may not be used to provide or maintain buildings used by religious organizations.

The University's argument misconceives the nature of this case. The question is not whether the creation of a religious forum would violate the Establishment Clause. The University has opened its facilities for use by student groups, and the question is whether it can now exclude groups because of the content of their speech. See *Healy* v. *James*, 408 U. S. 169 (1972).[13] In this context we are unpersuaded that the primary effect of the public forum, open to all forms of discourse, would be to advance religion.

We are not oblivious to the range of an open forum's likely effects. It is possible—perhaps even foreseeable—that religious groups will benefit from access to University facilities. But this Court has explained that a religious organization's enjoyment of merely "incidental" benefits does not violate the prohibition against the "primary advancement" of religion. *Committee for Public Education* v. *Nyquist*, 413 U. S. 756,

---

We do not believe that *Tilton* can be read so broadly. In *Tilton* the Court was concerned that a sectarian institution might convert federally funded buildings to religious uses or otherwise stamp them with the imprimatur of religion. But nothing in *Tilton* suggested a limitation on the State's capacity to maintain forums equally open to religious and other discussions. Cases before and after *Tilton* have acknowledged the right of religious speakers to use public forums on equal terms with others. See, *e. g.*, *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981); *Saia* v. *New York*, 334 U. S. 558 (1948).

[13] This case is different from cases in which religious groups claim that the denial of facilities *not* available to other groups deprives them of their rights under the Free Exercise Clause. Here, the University's forum is already available to other groups, and respondents' claim to use that forum does not rest solely on rights claimed under the Free Exercise Clause. Respondents' claim also implicates First Amendment rights of speech and association, and it is on the bases of speech and association rights that we decide the case. Accordingly, we need not inquire into the extent, if any, to which free exercise interests are infringed by the challenged University regulation. Neither do we reach the questions that would arise if state accommodation of free exercise and free speech rights should, in a particular case, conflict with the prohibitions of the Establishment Clause.

771 (1973); see, *e. g., Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736 (1976); *Hunt* v. *McNair,* 413 U. S. 734 (1973); *McGowan* v. *Maryland,* 366 U. S. 420, 422 (1961).

We are satisfied that any religious benefits of an open forum at UMKC would be "incidental" within the meaning of our cases. Two factors are especially relevant.

First, an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices. As the Court of Appeals quite aptly stated, such a policy "would no more commit the University . . . to religious goals" than it is "now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance," or any other group eligible to use its facilities. 635 F. 2d, at 1317.[14]

Second, the forum is available to a broad class of nonreligious as well as religious speakers; there are over 100 recognized student groups at UMKC. The provision of benefits to so broad a spectrum of groups is an important index of secular effect. See, *e. g., Wolman* v. *Walter,* 433 U. S. 229, 240–241 (1977); *Committee for Public Education* v. *Nyquist, supra,* at 781–782, and n. 38. If the Establishment Clause barred the extension of general benefits to religious groups, "a church could not be protected by the police and fire depart-

---

[14] University students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion. See *Tilton* v. *Richardson, supra,* at 685–686. The University argues that the Cornerstone students themselves admitted in affidavits that "[s]tudents know that if something is on campus, then it is a student organization, and they are more likely to feel comfortable attending a meeting." Affidavit of Florian Frederick Chess, App. 18, 19. In light of the large number of groups meeting on campus, however, we doubt students could draw any reasonable inference of University support from the mere fact of a campus meeting place. The University's student handbook already notes that the University's name will not "be identified in any way with the aims, policies, programs, products, or opinions of any organization or its members." 1980–1981 UMKC Student Handbook 25.

ments, or have its public sidewalk kept in repair." *Roemer* v. *Maryland Public Works Bd.*, *supra*, at 747 (plurality opinion); quoted in *Committee for Public Education* v. *Regan*, 444 U. S., at 658, n. 6.[15] At least in the absence of empirical evidence that religious groups will dominate UMKC's open forum, we agree with the Court of Appeals that the advancement of religion would not be the forum's "primary effect."

## B

Arguing that the State of Missouri has gone further than the Federal Constitution in proscribing indirect state support for religion,[16] the University claims a compelling interest in complying with the applicable provisions of the Missouri Constitution.[17]

The Missouri courts have not ruled whether a general policy of accommodating student groups, applied equally to those wishing to gather to engage in religious and nonreligious speech, would offend the State Constitution. We need not, however, determine how the Missouri courts would decide this issue. It is also unnecessary for us to decide whether, under the Supremacy Clause,[18] a state interest, derived from its own constitution, could ever outweigh free

---

[15] This Court has similarly rejected "the recurrent argument that all aid [to parochial schools] is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." *Hunt* v. *McNair*, 413 U. S. 734, 743 (1973).

[16] See, *e. g.*, *Americans United* v. *Rogers*, 538 S. W. 2d 711, 720 (Mo.) (en banc) (holding Missouri Constitution requires stricter separation of church and State than does Federal Constitution), cert. denied, 429 U. S. 1029 (1976); *Harfst* v. *Hoegen*, 349 Mo. 808, 815–816, 163 S. W. 2d 609, 613–614 (Mo. 1942) (en banc) (same).

[17] See Mo. Const., Art. 1, §§ 6, 7; Art. 9, § 8. In *Luetkemeyer* v. *Kaufmann*, 364 F. Supp. 376 (WD Mo. 1973), aff'd, 419 U. S. 888 (1974), the District Court found Missouri had a compelling interest in compliance with its own Constitution.

[18] U. S. Const., Art. VI, cl. 2.

speech interests protected by the First Amendment. We limit our holding to the case before us.

On one hand, respondents' First Amendment rights are entitled to special constitutional solicitude. Our cases have required the most exacting scrutiny in cases in which a State undertakes to regulate speech on the basis of its content. See, *e. g.*, *Carey* v. *Brown*, 447 U. S. 455 (1980); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972). On the other hand, the state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well. In this constitutional context, we are unable to recognize the State's interest as sufficiently "compelling" to justify content-based discrimination against respondents' religious speech.

## IV

Our holding in this case in no way undermines the capacity of the University to establish reasonable time, place, and manner regulations.[19] Nor do we question the right of the University to make academic judgments as to how best to allocate scarce resources or "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy* v. *New Hampshire*, 354 U. S. 234, 263 (1957) (Frankfurter, J., concurring in result); see *University of California Regents* v. *Bakke*, 438 U. S. 265, 312–313 (1978) (opinion of POWELL, J., announcing the judgment of the Court).[20] Fi-

---

[19] See, *e. g.*, *Grayned* v. *City of Rockford*, 408 U. S. 104, 116 (1972) ("The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable,'" quoting Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027, 1042 (1969)).

[20] In his opinion concurring in the judgment, *post*, at 277–287, JUSTICE STEVENS expresses concern that use of the terms "compelling state

nally, we affirm the continuing validity of cases, *e. g.*, *Healy v. James*, 408 U. S., at 188–189, that recognize a university's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education.

The basis for our decision is narrow. Having created a forum generally open to student groups, the University seeks to enforce a content-based exclusion of religious speech. Its exclusionary policy violates the fundamental principle that a state regulation of speech should be content-neutral, and the University is unable to justify this violation under applicable constitutional standards.

For this reason, the decision of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring in the judgment.

As the Court recognizes, every university must "make academic judgments as to how best to allocate scarce resources," *ante*, at 276. The Court appears to hold, however, that those judgments must "serve a compelling state interest" whenever they are based, even in part, on the content of speech. *Ante*, at 269–270. This conclusion apparently flows from the Court's suggestion that a student activities program—from which the public may be excluded, *ante*, at 267–268, n. 5—must be managed as though it were a "public forum."[1] In my opinion, the use of the terms "compelling

interest" and "public forum" may "undermine the academic freedom of public universities." As the text above makes clear, this concern is unjustified. See also n. 5, *supra*. Our holding is limited to the context of a public forum created by the University itself.

[1] As stated by the Court, "[i]n order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions." *Ante*, at 269–270. See also *ante*, this page, n. 20 ("Our holding is limited to the context of a public forum created by the University itself").

state interest" and "public forum" to analyze the question presented in this case may needlessly undermine the academic freedom of public universities.

Today most major colleges and universities are operated by public authority. Nevertheless, their facilities are not open to the public in the same way that streets and parks are. University facilities—private or public—are maintained primarily for the benefit of the student body and the faculty. In performing their learning and teaching missions, the managers of a university routinely make countless decisions based on the content of communicative materials. They select books for inclusion in the library, they hire professors on the basis of their academic philosophies, they select courses for inclusion in the curriculum, and they reward scholars for what they have written. In addition, in encouraging students to participate in extracurricular activities, they necessarily make decisions concerning the content of those activities.

Because every university's resources are limited, an educational institution must routinely make decisions concerning the use of the time and space that is available for extracurricular activities. In my judgment, it is both necessary and appropriate for those decisions to evaluate the content of a proposed student activity. I should think it obvious, for example, that if two groups of 25 students requested the use of a room at a particular time—one to view Mickey Mouse cartoons and the other to rehearse an amateur performance of Hamlet—the First Amendment would not require that the room be reserved for the group that submitted its application first. Nor do I see why a university should have to establish a "compelling state interest" to defend its decision to permit one group to use the facility and not the other. In my opinion, a university should be allowed to decide for itself whether a program that illuminates the genius of Walt Disney should be given precedence over one that may duplicate material adequately covered in the classroom. Judgments of

this kind should be made by academicians, not by federal judges,[2] and their standards for decision should not be encumbered with ambiguous phrases like "compelling state interest."[3]

---

[2] In *Sweezy* v. *New Hampshire*, 354 U. S. 234, Justice Frankfurter forcefully spoke of "the grave harm resulting from governmental intrusion into the intellectual life of a university . . . ." *Id.*, at 261 (concurring in result). Justice Frankfurter quoted with approval portions of an address by T. H. Huxley:

"'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Id.*, at 263.

Although these comments were not directed at a public university's concern with extracurricular activities, it is clear that the "atmosphere" of a university includes such a critical aspect of campus life. See also *University of California Regents* v. *Bakke*, 438 U. S. 265, 312 (opinion of POWELL, J.) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment"); Note, Academic Freedom and Federal Regulation of University Hiring, 92 Harv. L. Rev. 879 (1979). Cf. Van Alstyne, The Specific Theory of Academic Freedom and the General Issue of Civil Liberty, reprinted in The Concept of Academic Freedom 59, 77–81 (E. Pincoffs ed. 1972).

[3] In *Illinois Elections Bd.* v. *Socialist Workers Party*, 440 U. S. 173, JUSTICE BLACKMUN expressed concern with

"what seems to be a continuing tendency in this Court to use as tests such easy phrases as 'compelling [state] interest' and 'least drastic [or restrictive] means.' I have never been able fully to appreciate just what a 'compelling state interest' is. If it means 'convincingly controlling,' or 'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all. And, for me, 'least drastic means' is a slippery slope and also the signal of the result the Court has chosen to reach. A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down." *Id.*, at 188–189 (concurring opinion) (citation omitted).

Thus, I do not subscribe to the view that a public university has no greater interest in the content of student activities than the police chief has in the content of a soapbox oration on Capitol Hill. A university legitimately may regard some subjects as more relevant to its educational mission than others. But the university, like the police officer, may not allow its agreement or disagreement with the viewpoint of a particular speaker to determine whether access to a forum will be granted. If a state university is to deny recognition to a student organization—or is to give it a lesser right to use school facilities than other student groups—it must have a valid reason for doing so. *Healy* v. *James*, 408 U. S. 169.[4]

In this case I agree with the Court that the University has not established a sufficient justification for its refusal to allow the Cornerstone group to engage in religious worship on the campus. The primary reason advanced for the discriminatory treatment is the University's fear of violating the Establishment Clause. But since the record discloses no danger

---

[4] In *Healy*, the Court stated:

"The opinions below also assumed that petitioners had the burden of showing entitlement to recognition by the College. While petitioners have not challenged the procedural requirement that they file an application in conformity with the rules of the College, they do question the view of the courts below that final rejection could rest on their failure to convince the administration that their organization was unaffiliated with the National [Students for a Democratic Society]. For reasons to be stated later in this opinion, we do not consider the issue of affiliation to be a controlling one. But, apart from any particular issue, once petitioners had filed an application in conformity with the requirements, the burden was upon the College administration to justify its decision of rejection. It is to be remembered that the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities described above. While a college has a legitimate interest in preventing disruption on the campus, which under circumstances requiring the safeguarding of that interest may justify such restraint, a 'heavy burden' rests on the college to demonstrate the appropriateness of that action." 408 U. S., at 183–184 (footnotes and citations omitted).

that the University will appear to sponsor any particular religion, and since student participation in the Cornerstone meetings is entirely voluntary, the Court properly concludes that the University's fear is groundless. With that justification put to one side, the University has not met the burden that is imposed on it by *Healy*.

Nor does the University's reliance on the Establishment Clause of the Missouri State Constitution provide a sufficient justification for the discriminatory treatment in this case.[5] As I have said, I believe that the University may exercise a measure of control over the agenda for student use of school facilities, preferring some subjects over others, without needing to identify so-called "compelling state interests." Quite obviously, however, the University could not allow a group of Republicans or Presbyterians to meet while denying Democrats or Mormons the same privilege.[6] It seems apparent that the policy under attack would allow groups of young philosophers to meet to discuss their skepticism that a Supreme Being exists, or a group of political scientists to meet to debate the accuracy of the view that religion is the "opium of the people." If school facilities may be used to discuss anticlerical doctrine, it seems to me that comparable use by a group desiring to express a belief in God must also be permitted. The fact that their expression of faith includes ceremonial conduct is not, in my opinion, a sufficient reason for suppressing their discussion entirely.

Accordingly, although I do not endorse the Court's reasoning, I concur in its judgment.

---

[5] The University's asserted determination to keep Church and State completely separate, pursuant to the alleged dictates of the Missouri Constitution, is not without qualification. The very regulations at issue provide that "[n]o regulations shall be interpreted to forbid the offering of prayer or other appropriate recognition of religion at public functions held in University facilities. . . ." See *ante*, at 266, n. 3.

[6] See Farber, Content Regulation and the First Amendment: A Revisionist View, 68 Geo. L. J. 727 (1980).

JUSTICE WHITE, dissenting.

In affirming the decision of the Court of Appeals, the majority rejects petititoners' argument that the Establishment Clause of the Constitution prohibits the use of university buildings for religious purposes. A state university may permit its property to be used for purely religious services without violating the First and Fourteenth Amendments. With this I agree. See *Committee for Public Education* v. *Nyquist*, 413 U. S. 756, 813 (1973) (WHITE, J., dissenting); *Lemon* v. *Kurtzman*, 403 U. S. 602, 661 (1971) (opinion of WHITE, J.). The Establishment Clause, however, sets limits only on what the State may do with respect to religious organizations; it does not establish what the State is *required* to do. I have long argued that Establishment Clause limits on state action which incidentally aids religion are not as strict as the Court has held. The step from the permissible to the necessary, however, is a long one. In my view, just as there is room under the Religion Clauses for state policies that may have some beneficial effect on religion, there is also room for state policies that may incidentally burden religion. In other words, I believe the States to be a good deal freer to formulate policies that affect religion in divergent ways than does the majority. See *Sherbert* v. *Verner*, 374 U. S. 398, 422–423 (1963) (Harlan, J., dissenting). The majority's position will inevitably lead to those contradictions and tensions between the Establishment and Free Exercise Clauses warned against by Justice Stewart in *Sherbert* v. *Verner*, *supra*, at 416.

The University regulation at issue here provides in pertinent part:

"No University buildings or grounds (except chapels as herein provided) may be used for purposes of religious worship or religious teaching by either student or nonstudent groups. Student congregations of local

> churches or of recognized denominations or sects, although not technically recognized campus groups, may use the facilities . . . under the same regulations that apply to recognized campus organizations, provided that no University facilities may be used for purposes of religious worship or religious teaching."

Although there may be instances in which it would be difficult to determine whether a religious group used university facilities for "worship" or "religious teaching," rather than for secular ends, this is not such a case. The regulation was applied to respondents' religious group, Cornerstone, only after the group explicitly informed the University that it sought access to the facilities for the purpose of offering prayer, singing hymns, reading scripture, and teaching biblical principles. Cornerstone described their meetings as follows: "Although these meetings would not appear to a casual observer to correspond precisely to a traditional worship service, there is no doubt that worship is an important part of the general atmosphere." *Chess* v. *Widmar*, 480 F. Supp. 907, 910 (1979).[1] The issue here is only whether the University

---

[1] Cornerstone was denied access to University facilities because it intended to use those facilities for regular religious services in which "worship is an important part of the general atmosphere." There is no issue here as to the application of the regulation to "religious teaching." Reaching this issue is particularly inappropriate in this case because nothing in the record indicates how the University has interpreted the phrase "religious teaching" or even whether it has ever been applied to activity that was not clearly "religious worship." The District Court noted that plaintiffs did not contend that they were "limited, in any way, from holding on-campus meetings that do *not* include religious worship services." 480 F. Supp., at 913. At oral argument, counsel for the University indicated that the regulation would not bar discussion of biblical texts under circumstances that did not constitute "religious worship." Tr. of Oral Arg. 9. The sole question in this case involves application of the regulation to prohibit regular religious worship services in University buildings.

regulation as applied and interpreted in this case is impermissible under the Federal Constitution. If it is impermissible, it is because it runs afoul of either the Free Speech or the Free Exercise Clause of the First Amendment.

A large part of respondents' argument, accepted by the court below and accepted by the majority, is founded on the proposition that because religious worship uses speech, it is protected by the Free Speech Clause of the First Amendment.[2] Not only is it protected, they argue, but religious worship *qua* speech is not different from any other variety of protected speech as a matter of constitutional principle. I believe that this proposition is plainly wrong. Were it right, the Religion Clauses would be emptied of any independent meaning in circumstances in which religious practice took the form of speech.

Although the majority describes this argument as "novel," *ante*, at 269, n. 6, I believe it to be clearly supported by our previous cases. Just last Term, the Court found it suffi-

---

[2] Given that the majority's entire argument turns on this description of religious services as speech, it is surprising that the majority assumes this proposition to require no argument. The majority assumes the conclusion by describing the University's action as discriminating against "speakers based on their desire to . . . engage in religious worship and discussion." *Ante*, at 269. As noted above, it is not at all clear that the University has discriminated or intends to discriminate against "religious discussion"—as a preliminary matter, it is not even clear what the majority means by "religious discussion" or how it entered the case. That religious worship is a form of speech, the majority takes to have been established by three cases. *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981); *Niemotko* v. *Maryland*, 340 U. S. 268 (1951); *Saia* v. *New York*, 334 U. S. 558 (1948). None of these cases stand for this proposition. *Heffron* and *Saia* involved the communication of religious views to a nonreligious, public audience. Talk about religion and about religious beliefs, however, is not the same as religious services of worship. *Niemotko* was an equal protection challenge to a discriminatory denial of one religious group's access to a public park. The Court specifically stated that it was not addressing the question of whether the State could uniformly deny all religious groups access to public parks. 340 U. S., at 272.

ciently obvious that the Establishment Clause prohibited a State from posting a copy of the Ten Commandments on the classroom wall that a statute requiring such a posting was summarily struck down. *Stone* v. *Graham*, 449 U. S. 39 (1980). That case necessarily presumed that the State could not ignore the religious content of the written message, nor was it permitted to treat that content as it would, or must, treat other—secular—messages under the First Amendment's protection of speech. Similarly, the Court's decisions prohibiting prayer in the public schools rest on a content-based distinction between varieties of speech: as a speech act, apart from its content, a prayer is indistinguishable from a biology lesson. See *Abington School District* v. *Schempp*, 374 U. S. 203 (1963); *Engel* v. *Vitale*, 370 U. S. 421 (1962). Operation of the Free Exercise Clause is equally dependent, in certain circumstances, on recognition of a content-based distinction between religious and secular speech. Thus, in *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), the Court struck down, as violative of the Free Exercise Clause, a state requirement that made a declaration of belief in God a condition of state employment. A declaration is again a speech act, but it was the content of the speech that brought the case within the scope of the Free Exercise Clause.

If the majority were right that no distinction may be drawn between verbal acts of worship and other verbal acts, all of these cases would have to be reconsidered. Although I agree that the line may be difficult to draw in many cases, surely the majority cannot seriously suggest that no line may ever be drawn.[3] If that were the case, the majority would

---

[3] Indeed, while footnote 6 of the majority opinion suggests that no intelligible distinction may be drawn between worship and other forms of speech, footnote 9 recognizes that the Establishment Clause "requires" that such a line be drawn. The majority does not adequately explain why the State is "required" to observe a line in one context, but prohibited from voluntarily recognizing it in another context.

have to uphold the University's right to offer a class entitled "Sunday Mass." Under the majority's view, such a class would be—as a matter of constitutional principle—indistinguishable from a class entitled "The History of the Catholic Church." [4]

There may be instances in which a State's attempt to disentangle itself from religious worship would intrude upon secular speech about religion. In such a case, the State's action would be subject to challenge under the Free Speech Clause of the First Amendment. This is not such a case. This case involves religious worship only; the fact that that worship is accomplished through speech does not add anything to respondents' argument. That argument must rely upon the claim that the State's action impermissibly interferes with the free exercise of respondents' religious practices. Although this is a close question, I conclude that it does not.

Plausible analogies on either side suggest themselves. Respondents argue, and the majority agrees, that by permitting any student group to use its facilities for communicative purposes other than religious worship, the University has created a "public forum." *Ante*, at 267–268. With ample

---

[4] Counsel for respondents was somewhat more forthright in recognizing the extraordinary breadth of his argument, than is the majority. Counsel explicitly stated that once the distinction between speech and worship is collapsed a university that generally provides student groups access to its facilities would be constitutionally required to allow its facilities to be used as a church for the purpose of holding "regular church services." Tr. of Oral Arg. 26. Similarly, although the majority opinion limits its discussion to student groups, counsel for respondents recognized that the First Amendment argument relied upon would apply equally to nonstudent groups. He recognized that respondents' submission would require the University to make available its buildings to the Catholic Church and other denominations for the purpose of holding religious services, if University facilities were made available to nonstudent groups. *Id.*, at 39. In other words, the University could not avoid the conversion of one of its buildings into a church, as long as the religious group meets the same neutral requirements of entry—*e. g.*, rent—as are imposed on other groups.

support, they argue that the State may not make content-based distinctions as to what groups may use, or what messages may be conveyed in, such a forum. See *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972); *Cox* v. *Louisiana*, 379 U. S. 536 (1965). The right of the religious to nondiscriminatory access to the public forum is well established. See *Niemotko* v. *Maryland*, 340 U. S. 268 (1951); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). Moreover, it is clear that there are bounds beyond which the University could not go in enforcing its regulation: I do not suppose it could prevent students from saying grace before meals in the school cafeteria, or prevent distribution of religious literature on campus.[5]

Petitioners, on the other hand, argue that allowing use of their facilities for religious worship is constitutionally indistinguishable from directly subsidizing such religious services: It would "fun[d] a specifically religious activity in an otherwise substantially secular setting." *Hunt* v. *McNair*, 413 U. S. 734, 743 (1973). They argue that the fact that secular student groups are entitled to the in-kind subsidy at issue here does not establish that a religious group is entitled to the same subsidy. They could convincingly argue, for example, that a state university that pays for basketballs for the basketball team is not thereby required to pay for Bibles for a group like Cornerstone.[6]

---

[5] There are obvious limits on the scope of this analogy. I know of no precedent holding that simply because a public forum is open to all kinds of speech—including speech about religion—it must be open to regular religious worship services as well. I doubt that the State need stand by and allow its public forum to become a church for any religious sect that chooses to stand on its right of access to that forum.

[6] There are, of course, limits to this subsidy argument. *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and *Thomas* v. *Indiana Employment Security Division*, 450 U. S. 707 (1981), demonstrate that in certain circumstances the State may be required to "subsidize," at least indirectly, religious practices, under circumstances in which it does not and need not subsidize similar behavior founded on secular motives.

A third analogy suggests itself, one that falls between these two extremes. There are a variety of state policies which incidentally benefit religion that this Court has upheld without implying that they were constitutionally required of the State. See *Board of Education* v. *Allen*, 392 U. S. 236 (1968) (state loan of textbooks to parochial school students); *Zorach* v. *Clauson*, 343 U. S. 306 (1952) (release of students from public schools, during school hours, to perform religious activities away from the school grounds); *Everson* v. *Board of Education*, 330 U. S. 1 (1947) (state provision of transportation to parochial school students). Provision of university facilities on a uniform basis to all student groups is not very different from provision of textbooks or transportation. From this perspective the issue is not whether the State must, or must not, open its facilities to religious worship; rather, it is whether the State may choose not to do so.

Each of these analogies is persuasive. Because they lead to different results, however, they are of limited help in reaching a decision here. They also demonstrate the difficulty in reconciling the various interests expressed in the Religion Clauses. In my view, therefore, resolution of this case is best achieved by returning to first principles. This requires an assessment of the burden on respondents' ability freely to exercise their religious beliefs and practices and of the State's interest in enforcing its regulation.

Respondents complain that compliance with the regulation would require them to meet "about a block and a half" from campus under conditions less comfortable than those previously available on campus.[7] I view this burden on free exer-

---

[7] Respondents also complain that the University action has made their religious message less attractive by suggesting that it is not appropriate fare for the college campus. I give no weight to this because it is indistinguishable from an argument that respondents are entitled to the appearance of an endorsement of their beliefs and practices from the University.

cise as minimal. Because the burden is minimal, the State need do no more than demonstrate that the regulation furthers some permissible state end. The State's interest in avoiding claims that it is financing or otherwise supporting religious worship—in maintaining a definitive separation between church and State—is such an end. That the State truly does mean to act toward this end is amply supported by the treatment of religion in the State Constitution.[8] Thus, I believe the interest of the State is sufficiently strong to justify the imposition of the minimal burden on respondents' ability freely to exercise their religious beliefs.

On these facts, therefore, I cannot find that the application of the regulation to prevent Cornerstone from holding religious worship services in University facilities violates the First and Fourteenth Amendments. I would not hold as the majority does that if a university permits students and others to use its property for secular purposes, it must also furnish facilities to religious groups for the purposes of worship and the practice of their religion. Accordingly, I would reverse the judgment of the Court of Appeals.

---

[8] Since 1820, the Missouri Constitution has contained provisions requiring a separation of church and State. The Missouri Supreme Court has held that the state constitutional provisions are "not only more explicit but more restrictive than the Establishment Clause of the United States Constitution." *Paster* v. *Tussey*, 512 S. W. 2d 97, 102 (1974).