Greg TIPTON, as representative of Maranatha Campus Ministries of Hawaii, an unincorporated University Registered organization of the University of Hawaii; David Holmes–Smith; Jonathan Van Boskerk; Loree Johnson, and other students of the University of Hawaii similarly situated, Plaintiffs–Appellants,

v.

UNIVERSITY OF HAWAII; State of Hawaii; Kenneth Kato, in his capacity as member of the Board of Regents of the University of Hawaii, et al.; and American Civil Liberties Union of Hawaii, Defendants–Appellees.

No. 91–16790.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 3, 1993.

Decided Feb. 7, 1994.

William H. Lawson, Honolulu, Hawaii, for the plaintiffs-appellants.

Girard D. Lau, Deputy Attorney General, Honolulu, Hawaii, for defendants-appellees University of Hawaii, State of Hawaii Department of the Attorney General, Board of Regents of the University of Hawaii, the Attorney General of Hawaii and Deputy Attorneys General ("State Defendants").

Carl M. Varady, American Civil Liberties Union of Hawaii, Honolulu, Hawaii, for defendant-appellee American Civil Liberties Union of Hawaii.

Before: GOODWIN, TANG and NOONAN, Circuit Judges.

## OPINION

TANG, Senior Circuit Judge:

Plaintiffs Greg Tipton (representing Maranatha Campus Ministries of Hawaii) and certain University of Hawaii students (collectively, "Tipton") appeal the district court's grant of summary judgment in favor of defendants. Tipton sued the university, members of its Board of Regents, the office of the Hawaiian Attorney General (collectively, "University"), and the American Civil Liberties Union of Hawaii ("ACLU") after defendants agreed among themselves to withdraw funding of certain activities of student religious organizations. The district court rejected Tipton's constitutional claims. We affirm.

## I.

The Associated Students of the University of Hawaii at Manoa ("ASUH") is a student government organization which maintains a funding program for University Registered Organizations ("UROs"). ASUH is allotted money for distribution to UROs from the University of Hawaii Student Activities Revolving Fund. The Revolving Fund exists pursuant to statute, see Haw.Rev.Stat. § 304–8.6, and collects compulsory activity fees from students.

To receive funding from ASUH, UROs must submit an application. In allocating limited funds among URO applicants, ASUH will consider the significance of the proposed program, the probability of its success, the availability of funds and the history of past funding. ASUH favors programs with "inherent cultural, economic, or social impact, and those which strive to manifest [ASUH] goals," which include "develop[ing] a responsible as well as a critical awareness of prevalent attitudes and actions through participation in co-curricular activities." If ASUH approves a URO application, funds are distributed when the URO presents a receipt for approved expenditures. If the receipt is not in accord with ASUH approval, reimbursement is denied.

On February 9, 1989, the ASUH senate passed a bill approving several URO funding applications. In particular, ASUH agreed to pay for room rental and publicity expenses of events detailed in applications submitted by Maranatha Campus Ministries of Hawaii ("Maranatha"), Campus Crusade for Christ ("Crusade"), Hawaii Youth for Christ ("Hawaii Youth"), and Champions for Christ ("Champions").

The events for which Maranatha sought funding included "campus wide bible studies" intended "to inform and reach out to students with the message of the Gospel." Crusade wished to show a film entitled "How's Your Love Life," and "[t]o present a creative seminar to help students deal with relationships from a [C]hristian perspective." At the end of Crusade's presentation, "students [would be] given an opportunity to receive Christ ... as a suggested prayer for salva-

tion is given." Hawaii Youth sought funds for its freshman orientation camp in which a religious message might be conveyed. Finally, Champions asked for money to support weekly meetings meant to "provide [an] avenue for students to learn spiritual [truths] according to the Bible & how it can apply to daily living."

At the behest of certain students, the ACLU planned to sue Hawaiian officials on the ground that the February 1989 ASUH funding authorization violated the Establishment Clause of the First Amendment to the United States Constitution. In response, state officials agreed not to make the ASUH-authorized disbursements to Maranatha, Crusade, Hawaii Youth, Champions, "or any other group which would use the funds to promote a particular religious point of view, even if in a secular context." Under the Memorandum of Agreement, the state further stipulated not to "disburse any funds from the URO Funding Program that are intended to or actually benefit any sectarian program or activity of a URO." ASUH has since adopted the three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971), to assess URO funding applications.[1] Under the settlement, religious UROs remain eligible to seek ASUH funding for secular activities; there is no indication of discrimination against religious UROs per se.

As a result of the University's settlement with the ACLU, Maranatha, Crusade, Hawaii Youth, and Champions apparently lost the funding authorized by ASUH in February 1989. The contested ASUH funding authorization expired on April 28, 1989; the funds are therefore no longer available. The record specifies no particular future event, religious or otherwise, for which funding is sought.

In 1991 Tipton filed suit against the University and the ACLU under 42 U.S.C. § 1983, alleging violations of the Free Speech, Free Association, and Free Exercise Clauses, U.S. Const. amend. I, as well as the Equal Protection Clause, *id.* amend. XIV, § 1. The central allegation of Tipton's complaint is that, as a result of the settlement between the ACLU and the University, "the ASUH Senate and other student government bodies have ceased to fund religious URO's, even for activities which have a valid secular purpose." In his complaint, Tipton seeks declaratory and injunctive relief, and compensatory and punitive damages.

On the University's motion for summary judgment, the district court found that Tipton had no right to government-subsidized speech; that, even assuming funding creates a forum, the forum here was non-public and the access restrictions permissible; and that failure to fund Tipton's speech "did not have a 'tendency to coerce' plaintiffs to act contrary to their religious beliefs." Regarding Tipton's equal protection claim, the district court held that strict scrutiny was not applicable because university policy did not distinguish among particular religions. The rational purpose of avoiding Establishment Clause violations and threatened litigation therefore precluded an equal protection violation.

The district court also denied Tipton's motion to amend his complaint. By moving to amend, Tipton sought to overcome Eleventh Amendment defenses. Without ruling on these defenses, the district court indicated that they would bar all relief except prospective injunctions. The district court denied the motion to amend as futile in view of its rulings on the merits. The district court also dismissed all claims against the ACLU on the ground it was not a state actor.

Tipton appeals.

1. Specifically, the "1990–1991 ASUH Senate Funding Policies" include the following statement:

   To comply with the provisions of the Memorandum of Agreement, the ASUH Senate shall apply the 3-prong Lemon test (Lemon v. Kurtzman 403 U.S. 602):
   a. Does the program have a valid secular purpose?
   b. Does the primary effect of the program advance religion?
   c. Will the program create an excessive entanglement of church and state?
   If an application fails to meet any portion of the test as determined by the ASUH Senate, until circumstances warrant otherwise, that particular program shall not be eligible for funding.

## II.

### A.

We review de novo the district court's grant of summary judgment. *FSLIC v. Molinaro,* 889 F.2d 899, 901 (9th Cir.1989). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. *Id.* On summary judgment, determinations of material fact shall not be made where there is a genuine issue as to the existence of that fact. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). We may affirm the district court on any ground fairly supported by the record. *E.g., Lee v. United States,* 809 F.2d 1406, 1408 (9th Cir.1987), *cert. denied,* 484 U.S. 1041, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988).

### B.

Initially, we must identify the injury for which Tipton seeks redress. While he requests compensatory and punitive damages, neither the original nor the proposed amended complaint names a defendant from whom damages can be recovered notwithstanding the Eleventh Amendment; Tipton can only obtain prospective relief. Past events are therefore relevant only to decide whether equitable relief is available to prevent future injury.

The future harm anticipated here is also unclear, however, because Tipton alleges no specific, imminent event for which funding will be denied. Nevertheless, it can be fairly inferred that Tipton will again seek funding for an arguably religious event, albeit of unknown content. Fearing that future funding requests will be denied unlawfully, Tipton is primarily concerned about alleged defects in University policy, both written and unwritten. As such, this case concerns the future application of University policy based on (1) the stated manner in which policy will be applied (i.e., written policy), and (2) the manner in which policy will likely be applied in light of past applications (i.e., unwritten policy). Because Tipton attacks written and unwritten policies without identifying a particular future funding request, his claims present only facial challenges to the policies at issue.

### C.

So long as a state policy can be applied constitutionally under some set of circumstances, a facial challenge to that policy must ordinarily fail. *See, e.g., United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *IDK, Inc. v. Clark County,* 836 F.2d 1185, 1189 (9th Cir.1988).

The written policy at issue here calls for application of the *Lemon* test to determine whether ASUH funding of particular events comports with the Establishment Clause. Because the University's revised funding policy is derived directly from Establishment Clause jurisprudence, the policy is inherently constitutional so long as *Lemon* remains law of the land. *Cf. Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, ——, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993) (applying *Lemon* to find that admitting organization to limited public forum for purpose of presenting religious viewpoint on family issues does not violate the Establishment Clause). We therefore reject Tipton's facial challenge to the policy because it can be properly applied to deny funding in at least some instances.[2]

In addition to the policy of applying *Lemon,* the University has agreed with the ACLU not to "disburse any funds from the URO Funding Program that are intended to or actually benefit any sectarian program or activity of a URO." And, as to disburse-

---

**2.** We will not consider whether one invalid application would void the ASUH funding policy under the "overbreadth" exception to the usual analysis of facial challenges. A state policy that explicitly adopts a standard promulgated by the Supreme Court necessarily has a broad, "plainly legitimate sweep" that normally precludes overbreadth analysis. *See Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973).

ments authorized in February 1989, the University also agreed not to fund Tipton "or any other group which would use the funds to promote a particular religious point of view, even if in a secular context." As we will explain, to the extent this agreement deviates from the *Lemon* test it is nevertheless proper so long as it is evenly applied to all eligible groups seeking funds in support of non-sectarian events.

Generally speaking, the state is under no obligation to fund the exercise of constitutional rights. *E.g., Lipscomb v. Simmons,* 962 F.2d 1374, 1379 (9th Cir.1992) (en banc). "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way." *Rust v. Sullivan,* 500 U.S. 173, ——, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991). Here, the University has chosen to encourage student "participation in co-curricular activities" by funding a URO program in which a wide range of student groups are eligible for support. The fact that different criteria might have been adopted to evaluate URO funding does not invalidate the program actually adopted by the University.

We need not decide whether the University could outright refuse to fund all student religious organizations while funding the activities of other student groups. The University assures us that it evenly applies its funding criteria to all groups. Tipton does not dispute this. *See Bowen v. Kendrick,* 487 U.S. 589, 608, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988) (rejecting facial challenge to statute permitting religious institutions to participate as recipients of federal funds on the ground that religious institutions may receive public benefits that are neutrally available to all).

We also need not decide whether the University could fund purely religious events or "pervasively sectarian" student groups. *See Kendrick,* 487 U.S. at 609–10, 108 S.Ct. at 2574–75; *id.* at 623, 108 S.Ct. at 2582 (O'Connor, J., concurring). The University is now adamant in not funding religious events, and no one has argued or conceded that any student group here is "pervasively sectarian."[3]

Between the two extremes of denying student religious groups all financial support, on the one hand, and subsidizing indisputably religious activities, on the other, the University has wide latitude in adopting a funding policy to allocate the limited resources available to promote students' extracurricular activities. *See Rust,* —— U.S. at ——, 111 S.Ct. at 1773 ("Within far broader limits than petitioners are willing to concede, when the government appropriates public funds to establish a program it is entitled to define the limits of that program."); *Widmar v. Vincent,* 454 U.S. 263, 278, 281, 102 S.Ct. 269, 278, 280, 70 L.Ed.2d 440 (1981) (Stevens, J., concurring) (recognizing need for universities to consider content of proposed programs "in encouraging students to participate in extracurricular activities," and concluding that a university should be able to "exercise a measure of control over the agenda for student use of school facilities, preferring some subjects over others, without needing to identify so-called 'compelling state interests' "). Because Tipton does not allege that the University's written policies take an extreme position in funding student activities, we reject his facial attacks on these policies.[4]

---

**3.** We express no opinion whether the events for which Tipton sought funding in 1989 could be subsidized without violating the Establishment Clause.

**4.** Tipton's reliance at oral argument on *Christian Science Reading Room Jointly Maintained, Inc. v. City & County of San Francisco,* 784 F.2d 1010 (9th Cir.), *amended,* 792 F.2d 124 (9th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987), is misplaced. In the *Reading Room* case, we held that a change in policy governing rental of commercial space made for the purpose of remedying a perceived Establishment Clause violation lacks a rational basis if the perceived violation is illusory. 784 F.2d at 1016. In doing so, we invalidated the city's new policy barring rentals to religious groups and restored a policy of treating religious organizations like all others. The University, in contrast, applies its funding criteria evenly to all student groups and makes accommodation for funding certain activities of religious organizations.

We hasten to add, however, that whichever funding policy a university adopts to promote the extracurricular activities of students, the policy must be applied uniformly to all qualified applicants. Decisions denying funding for an expressive event based on the nature of an applicant rather than on established funding criteria will be subject to heightened scrutiny. *See Gay & Lesbian Students Ass'n v. Gohn,* 850 F.2d 361, 362 (8th Cir.1988) ("a public body that chooses to fund speech or expression must do so even-handedly, without discrimination among recipients on the basis of their ideology"); *cf. Lamb's Chapel,* —— U.S. at —— – ——, 113 S.Ct. at 2147–48 (in a case where religious group's film otherwise met criteria for use of limited public forum, access could not be denied on the basis that the film dealt with its subject from a religious viewpoint).[5]

### D.

Tipton also challenges certain future applications of University policy. As such, Tipton attacks unwritten policy as manifested in the University's application of its written policy. *Cf. International Caucus of Labor Comms. v. Metropolitan Dade County,* 724 F.Supp. 917, 919 (S.D.Fla.1989) (noting that the policy attacked by plaintiffs on First Amendment grounds "is not explicitly mentioned in the ordinance, but is an unwritten policy"). Such an attack bears much in common with a facial challenge on written policy. *See Kendrick,* 487 U.S. at 628, 108 S.Ct. at 2584 (Blackmun, J., joined by Brennan, Marshall, and Stevens, JJ., dissenting) ("a challenge that focuses on the *systematically unconstitutional operation* of a statute [can be referred to as either] a 'facial' challenge—because it goes to the statute as a whole—or an 'as-applied' challenge—because [it] rel[ies] on real-world

events") (emphasis added); *cf. Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1197 (11th Cir.1991) (acknowledging merit of "facial" attack on unwritten policy). To address such challenges, it is necessary to focus on "the type of relief prayed for by the plaintiffs, and the force of the arguments and supporting evidence they marshal." *Kendrick,* 487 U.S. at 627–28, 108 S.Ct. at 2584 (Blackmun, J., dissenting).

■ Tipton alleges that the University's unwritten policy is to deny all funding for activities with "religious overtones." His challenge here fails, however, because he has not shown that the University applies its written policy in any uniform manner indicating an unwritten practice that differs from written policy. Instead, the denial of funding in 1989 involved a single authorization that was partially rescinded pursuant to the University's express agreement with the ACLU. Tipton complains about no other specific denials of URO funding such that an unwritten pattern or practice might be identified.[6] Without some form of unwritten policy arising from the application of a written policy, there can be no "challenge that focuses on the systematically unconstitutional operation" of the written policy. *Cf. United States v. Pitts,* 908 F.2d 458, 460 (9th Cir.1990) (rejecting criminal defendant's equal protection challenge to a statute as applied because "[h]e fail[ed] to present . . . any evidence of a public authority applying the statute with an unequal hand": "Without evidence of how [the statute] has been applied to persons, we cannot find a[n unwritten] classification."); *Kendrick,* 487 U.S. at 620–21, 108 S.Ct. at 2580–81 (district court's findings on "as applied" challenge inadequate where, although the court identified specific constitutional vio-

---

**5.** It also would be improper for a university to use a system of funding student activities to circumvent the requirements of *Lamb's Chapel* and *Widmar,* which hold that if a school or university opens its facilities for even limited use by private individuals or organizations then the educational institution cannot discriminate on the basis of religious content (in the case of students wishing to use university facilities, as in *Widmar,* 454 U.S. at 277, 102 S.Ct. at 278) or on the basis of religious viewpoint (in the case of outside groups using public school facilities, as in *Lamb's Chapel,* —— U.S. at —— – ——, 113 S.Ct. at 2147–48).

At oral argument, Tipton acknowledged there is no indication whatsoever of any intent by the University to avoid *Widmar* and *Lamb's Chapel.*

**6.** Tipton does point to a few subsequent instances where funding was provided to religious organizations. For example, religious UROs received funds for providing workers at student elections. However, University funding of a few "exclusively secular activities"—as Tipton refers to them— says little about the kind of activities the University might refuse to fund.

lations, it failed to make findings on "the Secretary's administration of the statute"). Furthermore, even if Tipton could prove such a policy, it is likely permissible under the analysis of section II.C, *supra*, so long as it is uniformly applied.

### III.

Tipton does not challenge the district court's dismissal of the ACLU. Apparently he included the ACLU in this appeal so that the party might defend its interest in the Memorandum of Agreement signed with the University. The ACLU now asks for sanctions for being made to file a brief on the merits of Tipton's claims against it.

■ We do not condone the practice of including in an appeal entities which are not parties to the claims that will be affected by the appeal. *See Newton v. Uniwest Fin. Corp.*, 967 F.2d 340, 347–48 (9th Cir.1992) (sanctioning appellant for including unnecessary party in appeal). Here, Tipton's arguments on appeal could only have resulted in reversal as to his claims against the University. Tipton therefore should have excluded the ACLU from the proceeding here by noticing an appeal only from that portion of the judgment respecting claims against the University. *See id.* (citing Fed.R.App.P. 3(c)). In no event should Tipton have waited until his reply brief to disclose his benevolent purpose in requiring the ACLU to appear before us. *See id.* at 348. We decline to impose sanctions, however, because Tipton's effort at including the ACLU in this appeal was not intended to gain an advantage or to unnecessarily prolong his case against the civil rights organization.

**AFFIRMED.**