12 F.3d 1244
 88 Ed. Law Rep. 552
 Donna POPE, by her guardian ad litem William POPE, Appellee,
v.
EAST BRUNSWICK BOARD OF EDUCATION; David Seiden, in his
official capacity; Patrick Sirr, in his official capacity;
Donald Dicenzo, in his official capacity; Kitty Martin, in
her official capacity; Thomas Maughan, in his official
capacity; Henry Przystup, in his official capacity; Neal
Rosen, in his official capacity; Norma Teicher, in her
official capacity; Robert Van Wagner, in his official
capacity; Jon Kopko, in his official capacity, Appellants.
 No. 93-5292.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 31, 1993.
Decided Dec. 23, 1993.
 
 Martin R. Pachman (argued), Martin R. Pachman, P.C., Freehold, NJ, for appellants.
 Susan S. Rankin (argued), Piscataway, NJ, for appellee.
 Steven T. McFarland, Bradley P. Jacob, Kimberlee Wood Colby, Center for Law & Religious Freedom, Christian Legal Soc., Annandale, VA, for amicus curiae.
 Before: BECKER, NYGAARD and ALITO, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 The East Brunswick Board of Education and its individual members appeal from an order of the district court granting permanent injunctive relief and nominal damages to plaintiff Donna Pope. The district court held that East Brunswick violated the Equal Access Act, 20 U.S.C. Sec. 4071 et seq., by refusing to certify plaintiff's Bible Club as a student organization and accord it equal treatment with other student groups at East Brunswick High School. Because we find that East Brunswick failed in its attempt to close its limited open forum, we will affirm.
 
 I.
 A.
 
 2
 In Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Supreme Court held that a state college that maintained a limited public forum violated the First Amendment Free Speech Clause when it refused a religious student group access to school facilities. It also held that allowing such access would not violate the Establishment Clause of the First Amendment. Id. at 276-77, 102 S.Ct. at 277-78.
 
 
 3
 The question left unanswered by Widmar was whether its rationale extended to secondary schools as well as universities. Justice Powell, writing for the majority, noted that college students "are less impressionable than younger students" and should therefore understand that a policy of equal access for religious groups does not imply impermissible state endorsement of religion. Id. at 274 & n. 14, 102 S.Ct. at 276-77 & n. 14. We later held that equal access for religious groups in secondary schools violated the Establishment Clause, focusing on the differences between the high school and college environments and the maturity of their respective students. Bender v. Williamsport Area School Dist., 741 F.2d 538, 551-55 (3d Cir.1984), vacated on other grounds, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).
 
 
 4
 Congress responded in 1984 by enacting the Equal Access Act, Pub.L. 98-377, 98 Stat. 1302 (codified at 20 U.S.C. Secs. 4071-74). Under the Act, if a public secondary school receives federal financial assistance and has a "limited open forum," it may not discriminate against or deny equal access to student groups based on the religious or other content-based nature of the speech at their proposed meetings. 20 U.S.C. Sec. 4071(a). A limited open forum, in turn, is created whenever a school allows "one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. Sec. 4071(b). In Board of Educ. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), the Supreme Court held that the Act was, at least on the facts presented there, constitutional. Id. at 253, 110 S.Ct. at 2373. Perhaps more important for the purposes of this case, it defined the term "noncurriculum related student group." 496 U.S. at 239-40, 110 S.Ct. at 2366.
 
 B.
 
 5
 These facts have been stipulated by the parties. The East Brunswick Board of Education is the elected school board governing East Brunswick High School, where plaintiff attended from 1988 until she graduated in 1991. Plaintiff and other students met informally in the cafeteria before the start of Wednesday classes. This group of students was known within the school as the Bible Club. East Brunswick tolerated these meetings, but gave the Bible Club no official recognition. The club was thus precluded from using the public address system, bulletin boards and other school facilities commonly used by other student groups. In 1988, when the Bible Club sought official recognition from school authorities, East Brunswick permitted extracurricular groups to be initiated by students and the school administration apparently had the power to approve or deny such requests. It chose to deny certification to the Bible Club.
 
 
 6
 In June 1989, East Brunswick adopted its initial version of Policy 6145, which governed extra-curricular activities. That policy provided, in pertinent part:
 
 
 7
 The Board of Education considers extra-curricular activities to be an integral part of the educational program. The Board requires that:
 
 
 8
 . All clubs and other extra-curricular activities are related to the curriculum.
 
 
 9
 . All clubs and other extra-curricular activities have a faculty adviser who supervises all meetings and other programs sponsored by the club.
 
 
 10
 . All clubs and other extra-curricular activities and their advisers are approved by the Board before being permitted to function. The superintendent or his/her designee will recommend a list of clubs and other extra-curricular activities to the Board for approval in July or January of each school year.
 
 
 11
 . Building principals shall establish procedures for students to use when requesting the formation of clubs and shall provide information about the procedures to students annually.
 
 
 12
 This version of Policy 6145 required that all student groups be "related to the curriculum" and tracked closely the language of section 4071(b), which triggers the Act only when student groups not related to the curriculum are permitted to use school facilities. Based on Policy 6145, East Brunswick again denied the Bible Club's request for recognition for the 1989-1990 school year.
 
 
 13
 In June 1990, the Supreme Court in Mergens set forth the definition of a "noncurriculum related student group" that would trigger the Act:
 
 
 14
 [W]e think that the term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not directly relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit.
 
 
 15
 496 U.S. at 239-40, 110 S.Ct. at 2366. In response, East Brunswick once again amended Policy 6145 to track not only the language of the Act, but the Mergens opinion as well. It reads:
 
 
 16
 The Board of Education considers co-curricular activities and clubs to be an integral part of the educational program. The Board of Education, therefore, specifically reserves to itself the right to sponsor such clubs and activities as will further the educational goals of the district. Only such clubs and activities as are sponsored by the Board through the process hereinafter set forth will be permitted access to school facilities and personnel. The specific purpose and intent of this policy is to create a closed forum within the meaning and intent of 20 U.S.C. 4071 et seq.
 
 
 17
 Sponsorship by the Board shall consist of the approval of the club or activity together with the appointment of a faculty member who ... shall promote, lead and participate in all meetings and programs of the club or co-curricular activity.
 
 
 18
 All co-curricular clubs and activities to be approved for Board sponsorship shall be directly related either to specific subject matter which is the subject of one or more courses offered in the school district, concern the body of courses offered as a whole, or provide experiences which are deemed by the school district to enhance understanding of a course or courses offered within the district curriculum. The Board may also, from time to time, approve and sponsor co-curricular activities including but not limited to intramural and interscholastic athletic or academic squads, student government and scholastic achievement organizations, and service activities.
 
 
 19
 The sponsorship of clubs and co-curricular activities shall arise only by formal action of the Board upon recommendation of the superintendent of schools....
 
 
 20
 Suggestions for Board-sponsored clubs and activities will be accepted from all sources, including community, staff and students. No student-initiated co-curricular club or activity will be permitted except through the process outlined in this policy.
 
 
 21
 Following this amendment, several student organizations that had been certified apparently became casualties of the new policy. These included the Audio Visual Club, the Bicycle Club, the Booster Club, Youth Ending Hunger and a club devoted to rock and new wave music. Many clubs not obviously associated with the East Brunswick curriculum, however, returned in the new school year, including Drama, Folio (Art), Folio (Literary), Institute for Political/Legal Education Club, Students Against Drunk Drivers, Students Against Violating the Environment, and the Key Club, a service organization associated with Kiwanis. Although the Bible Club again petitioned for recognition, East Brunswick denied its request on the ground that it was not curriculum-related.
 
 C.
 
 22
 Donna Pope, through her father, filed this suit in the district court under 42 U.S.C. Sec. 1983. Count one of her complaint alleged a variety of constitutional deprivations, the most significant of which was an allegation that by failing to recognize the Bible Club, East Brunswick violated her rights to free speech and free exercise of religion. Count two alleged a violation of the Equal Access Act. Pope sought declaratory and injunctive relief, nominal damages and attorney's fees.
 
 
 23
 Following discovery, both parties moved for summary judgment. After a hearing, the district court denied East Brunswick's motion for summary judgment and granted summary judgment for Pope. It ruled that East Brunswick, by not recognizing the Bible Club, violated the Equal Access Act.[1] Delivering its opinion from the bench, the court stated:
 
 
 24
 [In Mergens,] the Supreme Court held the Equal Access Act to be constitutional by an 8-1 vote. That being the case it does not behoove a school board, or any court for that matter, to disregard a law duly enacted by a democratically elected Congress and upheld by the highest court of the land.
 
 
 25
 Unfortunately, ... such is the situation of this case. The East Brunswick School Board, unwilling to simply follow the Act and allow a voluntary religious group to meet, has searched the Act and scoured the language of Mergens itself for loopholes that would allow it to continue discriminating against voluntary religious groups. As I hold today their efforts are to no avail.
 
 
 26
 The court held that Policy 6145, which prohibits student-initiated groups, did not render the Act inapplicable to East Brunswick; that the special extracurricular supervisory duties imposed on school districts by New Jersey law did not cause an Establishment Clause violation; and that the Key Club was a noncurriculum related student group, creating a limited open forum and triggering the Act. It then entered a permanent injunction enjoining East Brunswick from "interfering with the rights granted plaintiff by the Equal Access Act to form a voluntary student Bible Club at defendants' school...."[2]
 
 
 27
 This appeal followed. The district court had subject matter jurisdiction under 28 U.S.C. Sec. 1343. We have appellate jurisdiction under 28 U.S.C. Sec. 1291.[3] We exercise de novo review over the district court's summary judgment.
 
 II.
 
 28
 Congress enacted the Equal Access Act almost a decade ago "to address perceived widespread discrimination against religious speech in public schools." Mergens, 496 U.S. at 239, 110 S.Ct. at 2366. It was not intended to be "merely hortatory," see id. at 245, 110 S.Ct. at 2369; rather, "its sponsors contemplated that the Act would do more than merely validate the status quo."[4] Id. at 239, 110 S.Ct. at 2366. Accordingly, the Supreme Court determined that the Act should be construed broadly in order to effectuate the congressional purpose of "end[ing] discrimination by allowing students to meet and discuss religion before and after classes." See id. To that end, the existence of a limited open forum, and concomitantly the applicability of the Act itself, "is triggered by what a school does, not by what it says." Id. at 244, 110 S.Ct. at 2369; see also id. at 279, 110 S.Ct. at 2387 (Stevens, J., dissenting).
 
 
 29
 On the other hand, the choice of whether to maintain a limited open forum or a closed forum remains with the school district. The Supreme Court in Mergens stated that, "[t]o the extent that a school chooses to structure its course offerings and existing student groups to avoid the Act's obligations, that result is not prohibited by the Act." Id. at 241, 110 S.Ct. at 2367. Moreover, a school need not tolerate student meetings that "materially and substantially interfere with the orderly conduct of educational activities within the school." Id. (quoting 20 U.S.C. Sec. 4071(c)(4)). And finally, a school district that does not wish to be subject to the Act's requirements may elect to forgo federal funding. Id. Thus, while the Act is construed broadly, it is not an all-pervasive scheme of federal regulation.
 
 
 30
 With these principles in mind, we will examine the three arguments made by East Brunswick on appeal: first, that because no student-initiated groups are permitted under Policy 6145, the Act does not apply to its schools; second, that the Key Club is related to the high school curriculum; and third, that enforcement of the Act in East Brunswick's case would violate the Establishment Clause.
 
 A.
 
 31
 East Brunswick, when it adopted and amended Policy 6145, required that all student activities be Board-sponsored rather than student-initiated. Based on Policy 6145, it argues that it is exempt from the provisions of the Act, specifically section 4071(b). That section reads:A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.
 
 
 32
 East Brunswick asserts that the proper statutory construction of the phrase "noncurriculum related student groups" includes the requirement of student initiation; because Policy 6145 made student initiation unavailable, defendants argue that there was no limited open forum at the high school. The district court rejected East Brunswick's argument, and so do we.
 
 
 33
 We begin our analysis, as we must, with the text of the statute. Section 4071(b) defines the conditions that create a limited open forum and trigger the Act. As set forth above, that section refers only to student groups, saying nothing about whether such groups must be student-initiated as well. Section 4071(c)(1), however, does include that concept. In describing the requirements for meetings that must be allowed once the Act is triggered, it recites that "the meeting [must be] voluntary and student-initiated." In drafting the Act, Congress included the concept of student initiation in a section unrelated to the question of when a limited open forum exists, yet failed to include it in section 4071(b), the one section that speaks directly to the issue. Based on these differences, the district court held that the lack of student initiation in the East Brunswick schools was irrelevant to whether the high school maintained a limited open forum.
 
 
 34
 The district court's rationale is persuasive, and East Brunswick does not directly challenge it. Congress must be presumed to know the meanings of the words and phrases it uses in drafting statutes. When it refers to student initiation in one section of the Act but omits it in another, the statute should normally be construed to give effect to the distinction Congress makes thereby. Cf. Mergens, 496 U.S. at 242, 110 S.Ct. 2367-68.
 
 
 35
 Instead, East Brunswick asserts that the district court erred by not giving proper effect to the Act's legislative history. We disagree; indeed, in the wake of Mergens, the legislative history of the Equal Access Act has little if any value beyond proving the existence of a "broad legislative purpose" behind its passage. See id. at 239, 110 S.Ct. at 2366. As the Supreme Court stated.
 
 
 36
 Although the phrase "noncurriculum related student group" nevertheless remains sufficiently ambiguous that we might normally resort to legislative history, ... we find the legislative history on this issue less than helpful. Because the bill that led to the Act was extensively rewritten in a series of multilateral negotiations after it was passed by the House and reported out of committee by the Senate, the Committee Reports shed no light on the language actually adopted. During congressional debate on the subject, legislators referred to a number of different definitions, and thus both petitioners and respondents can cite to legislative history favoring their interpretation of the phrase.
 
 
 37
 Id. at 238, 110 S.Ct. at 2366-67 (citation omitted).
 
 
 38
 We think that reliance on legislative history is hazardous at best, but where "not even the sponsors of the bill knew what it meant," such reliance cannot form a reasonable basis on which to interpret the text of a statute.
 
 
 39
 Id. at 242-43, 110 S.Ct. at 2368 (quoting Douglas Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 N.W.L.Rev. 1, 38 (1986)).[5]
 
 
 40
 In any event, we also find the legislative history of no value.[6] East Brunswick quotes at length from an exchange between Senators Gorton and Hatfield. See 130 Cong.Rec. 19222-25 (1984). The inherent unreliability of this colloquy, however, is manifestly evident. Professor Laycock has stated that, "[u]nder skillful cross-examination, [Senator] Hatfield offered just about every possible interpretation in less than two columns of the Congressional Record. ... [Senator] Hatfield can be quoted to prove anything, which means he proves nothing." Laycock, supra, at 37-39. Moreover, the senators' discussion did not even address the fine distinction at issue here. Instead, it concerned which non-religious and potentially troublesome groups a school would have to allow to meet once the Act was triggered and whether those groups would have to be student-organized or could be initiated by outside activists.
 
 
 41
 East Brunswick also seeks support in guidelines for implementing the Act which were prepared by a diverse coalition of interest groups, some supporting the legislation and others opposing it. See 130 Cong.Rec. 32315-18 (1984). These guidelines, however, are likewise of no value to the court. Although they were inserted into the Congressional Record, the guidelines were prepared after the bill was enacted into law and by their own terms (as well as common sense) "do not reflect the official position of the Congress."[7] Id. at 32318.
 
 
 42
 East Brunswick next makes an argument from the language of Mergens itself. It points to a few passing references in the plurality, concurring and dissenting opinions which use the terms "student group" and "student initiated group" interchangeably. Notably, these portions of the opinions do not discuss the statutory interpretation of the Act, but are directed toward the determination of its constitutionality. The plurality and separate opinions were not even dealing with an issue of statutory construction, much less the precise question at issue here. We decline to depart from a textual construction of Act based on a perceived imprecision in the Court's language. When an opinion is ambiguous and does not even address the relevant issue explicitly, it cannot outweigh stronger and more persuasive sources of guidance on the construction of a statute. See Salem Nat'l Bank v. Smith, 890 F.2d 22, 24 (7th Cir.1989) (Easterbrook, J., noting colorfully that "[a]ppellate opinions are not like the entrails of sheep, to be read for omens").
 
 
 43
 Even if any doubt remained whether student initiation is required to trigger the Act, the Supreme Court in Mergens held that the Act should be interpreted broadly to effectuate the intent of Congress. 496 U.S. at 239, 110 S.Ct. at 2366. This also militates against restrictively reading a student initiation requirement into the Act. The Mergens Court was justly concerned that school districts such as East Brunswick should not be permitted to make the Act meaningless by "strategically defining existing student groups" in ways that resulted "in almost no schools having limited open fora." Id. at 244, 110 S.Ct. at 2369. While the Court was addressing a different aspect of the definition of a noncurriculum related student group, a point which we treat below, we believe its concern extends equally to whether student initiation should be required. In his insightful article cited by the Supreme Court in Mergens, Professor Laycock agrees:
 
 
 44
 [A] limitation to student-initiated groups defeats the broader purpose of the statute. A school with many faculty-initiated student groups can largely preempt demand for student-initiated groups. The result could be an open forum for mainstream interests and views, all sponsored by the faculty, with minority views excluded because of faculty hostility or indifference. Such a school would exclude religious groups with the ironclad excuse that the faculty could not sponsor one.
 
 
 45
 Laycock, supra, at 39-40; see also Merle W. Fleming & Ronald L. Peller, Mergens: The Beginning, Not the End, of Questions Arising Under the Equal Access Act, 64 Educ.Law Rep. 15, 23 (1991) (student initiation not legally relevant).
 
 
 46
 We therefore conclude that student initiation of clubs and other groups is not a requirement for triggering the Equal Access Act.[8] We turn next to the issue of whether East Brunswick maintained a limited open forum by permitting a noncurriculum related student group to meet on school premises.
 
 B.
 
 47
 The district court concluded that East Brunswick had created a limited open forum by allowing at least one noncurriculum related student group, the Key Club, to meet on school premises. Rejecting East Brunswick's contention that the Key Club was related to the high school curriculum, the court held that any nexus between the club and the curriculum was insufficient to satisfy the standards set forth in Mergens. We agree.
 
 
 48
 In Mergens, the Supreme Court defined the meaning of the statutory term "noncurriculum related student group" found in section 4071(b) of the Equal Access Act. After engaging in a textual analysis of the statutory language, the Court stated that
 
 
 49
 a curriculum-related student group is one that has more than just a tangential or attenuated relationship to courses offered by the school. Because the purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other noncurriculum-related student groups on the other, the Act is premised on the notion that a religious or political club is itself likely to be a noncurriculum-related student group. It follows, then, that a student group that is "curriculum related" must at least have a more direct relationship to the curriculum than a religious or political club would have.
 
 
 50
 Id. at 238, 110 S.Ct. at 2365. It then held that "the term 'noncurriculum related student group' is best interpreted broadly to mean any student group that does not directly relate to the body of courses offered by the school." Id. at 239, 110 S.Ct. at 2366 (emphasis in original). The Court then set forth a four-part test for determining when a student group directly relates to the school curriculum, consistent with its view that Congress intended to set a low threshold for triggering the Act:
 
 
 51
 1. The group's subject matter is (or soon will be) taught in a regularly offered course;
 
 
 52
 2. The group's subject matter concerns the body of courses as a whole;
 
 
 53
 3. Participation in the group is required in a particular course; or
 
 
 54
 4. Academic credit is given for participation in the group.
 
 
 55
 Id. at 239-40, 110 S.Ct. at 2366.
 
 
 56
 East Brunswick argues that the Key Club was related to the high school curriculum under the test set forth in Mergens. To evaluate the legal merits of this contention, we first consider the nature of the club itself. The Key Club is a student service organization affiliated with Kiwanis. It is one of several such clubs common in American high schools.[9] The purpose of the Key Club is best described by the defendants' affidavit:
 
 
 57
 This community service organization ... assists and enhances the students in developing their civic responsibilities to the community and in support of the state's Thorough and Efficient Education requirements. The students in the Key service organization draw upon all curricula areas.
 
 
 58
 To that end, the bulk of the Key Club's activities involve a variety of student-initiated fund-raising activities, such as volleyball marathons, bowl-a-thons, game nights, and book, food and toy drives. The proceeds from these activities are donated to local charities. It is not an advocacy group for the poor and homeless, nor does it engage in direct, street-level outreach to such persons.
 
 
 59
 Nevertheless, East Brunswick asserts that the subject matter of the Key Club is directly related to the high school's History and Humanities classes, which teach a unit on homelessness, hunger and poverty. Richard Koenigsberg, the teacher of those classes, testified in his deposition that he believes it is important to relate the study of history to current social conditions. As part of that study, the class participates in and coordinates the Key Club's food and toy drives. Based on this participation in two of the Key Club's many activities, East Brunswick asserts that the club's existence does not create a limited open forum and trigger the Act. We disagree.
 
 
 60
 The parties have stipulated that students receive no academic credit for membership in the Key Club. And although defendants submitted the deposition of Assistant Principal Leslie Szukics to the district court for the proposition that the club's activities were related to a variety of curricular subjects, East Brunswick has prudently not emphasized this contention on appeal. In discussing groups whose subject matter "concerns the body of courses as a whole," the Mergens Court offered as its sole example a student government group, on the rationale that it might involve itself in proposals relating to current and future course offerings. Id. at 240, 110 S.Ct. at 2366. The Court did not suggest that student government would be curriculum-related because its activities related in some way to subjects taught across a high school curriculum; indeed, such a statement would be at odds with its earlier statement that the group-curriculum relationship must be more than "tangential or attenuated." We doubt, in fact, whether this principle in Mergens extends much further than the student government organization mentioned by the Court.
 
 
 61
 On appeal, East Brunswick argues primarily that the participation in Key Club activities by Mr. Koenigsberg's students is sufficient to meet the third prong of the Mergens test: that "participation in the group is required in a particular course." We disagree. It is stipulated that, while students participated in one or two of the Key Club's activities, there was no requirement that the students maintain membership in the club. Significantly, the Mergens Court did not indicate that participation in one or more of the group's activities would be sufficient to make the group curriculum related, but instead focused on participation in the group. We believe this choice of language was intentional. Had the Supreme Court adopted the former language, schools could then evade the Act by the simple expedient of requiring some or all students to participate in a single activity or meeting of each group with which the school's administrators wished to create a curriculum relationship. Such a result would not be consistent with the low threshold for triggering the Act and would indeed render it "merely hortatory."
 
 
 62
 Although East Brunswick focuses mostly on the third prong of the Mergens test, it also contends that the subject matter of the Key Club is taught in the Humanities classes at the high school. The burden of showing that a group is directly related to the curriculum rests on the school district. Mergens, 496 U.S. at 240, 110 S.Ct. at 2366. In Mergens, the defendant school district attempted to justify two service clubs, Interact and Zonta, because they promoted effective citizenship, an educational goal of the Social Studies Department. Id. at 244, 110 S.Ct. at 2369. The Supreme Court disagreed:
 
 
 63
 To the extent that petitioners contend that "curriculum related" means anything remotely related to abstract educational goals, however, we reject that argument. To define "curriculum related" in a way that results in almost no schools having limited open fora, or in a way that permits schools to evade the Act by strategically describing existing student groups, would render the Act merely hortatory.
 
 
 64
 Id.
 
 
 65
 Here, the nexus between the service club and the curriculum is stronger than it was in Mergens. The activity of the Key Club that East Brunswick relies upon is not merely connected in some abstract sense to an overall goal of "good citizenship," but is tied directly to a specific instructional unit of a specific course. Nevertheless, East Brunswick's argument remains flawed and cannot prevail.
 
 
 66
 Mergens did not hold that the activities of a student organization need only relate in some marginal way to something taught in class. Rather, the Court said that the subject matter of the student group must be taught in a class. Thus, a chess club does not become curriculum-related merely because its subject matter relates to mathematics and science by building the ability to engage in critical thought processes; unless chess is actually taught, the club is a noncurriculum related student group. See id. at 244, 110 S.Ct. at 2368-69. A French club, on the other hand, is curriculum-related as long as the school teaches French in a regularly offered course. Id. at 240, 110 S.Ct. at 2366. Here, the relevant subject matter of one unit of Mr. Koenigsberg's History course is poverty and homelessness. The subject matter of the Key Club is not poverty and homelessness, but community-related service and fund-raising activities. The history course and the Key Club accordingly have different subject matter.
 
 
 67
 Our view is supported by the policy concerns expressed in the Mergens opinions. The Mergens majority was justly troubled by the possibility that school systems would evade the Act's requirements "by strategically describing existing student groups." See id. at 244, 110 S.Ct. at 2369. Justice Stevens, writing in dissent, warned that it was possible a school may attempt to make a scuba club curriculum-related by including one hour of underwater diving instruction in its swimming classes. Id. at 279, 110 S.Ct. at 2387. Conversely, we can envision a scenario in which an otherwise noncurriculum related chess club holds a bake sale to send its top player to a regional tournament. Under East Brunswick's rationale, the chess club would immediately relate to the Home Economics, Business, Accounting, Mathematics and Sociology curricula. Nevertheless, a few isolated club activities cannot be permitted to turn an otherwise noncurriculum related student group into a curriculum-related one. Rather, the curriculum-relatedness of a student activity must be determined by reference to the primary focus of the activity measured against the significant topics taught in the course that assertedly relates to the group.
 
 
 68
 Finally, the Mergens court specifically stated that for an activity to be curriculum-related, it "must at least have a more direct relationship to the curriculum than a religious or political club would have." Id. at 238, 110 S.Ct. at 2365. It is evident that the Bible relates generally to subjects taught in high school.[10] Indeed, according to respected authorities, no single book has had a greater influence on Western civilization, history and thought than has the Bible. See, e.g., Engel v. Vitale, 370 U.S. 421, 434, 82 S.Ct. 1261, 1268, 8 L.Ed.2d 601 (1962) ("The history of man is inseparable from the history of religion."); Jacob Needleman, The Heart of Philosophy 27 (1982) (teachings of Plato and the Bible account for ninety percent of Western philosophical thought). So too, the Bible's teachings on concern for the poor are at least as related to the History and Humanities curriculum as is participation in the Key Club's food and toy drives.[11] In addition, in its King James translation, the Bible remains a veritable monument of our English prose, and its phrases, allegories, similes and metaphors are firmly embedded in common English usage.[12] It remains the most quoted work in The Oxford Dictionary of Quotations (3d ed. 1980). We conclude that upon the comparative-relatedness balance of Mergens, the Key Club is found wanting.[13]
 
 
 69
 East Brunswick attempted to restructure its existing student groups, striving mightily not to trigger the Act. We conclude, however, that it has indeed triggered it. Nonetheless, we do not hold today that a school district can never close a limited open forum once such a forum has been created; only that East Brunswick did not. Indeed, the Mergens Court specifically stated that school districts retain a measure of control under the Act. See id. 496 U.S. at 240-41, 110 S.Ct. at 2367. Although it has failed to do so yet, East Brunswick remains free to wipe out all of its noncurriculum related student groups and totally close its forum. While that option may be antithetical to progressive concepts of education, that cost, like the rejection of federal funds, is the burden that Congress imposed on school districts that do not wish to allow religious and other student groups equal access to their facilities.
 
 C.
 
 70
 Finally, East Brunswick argues that, even if it did maintain a limited open forum and thereby become subject to the requirements of the Equal Access Act, enforcing the statute would violate the Establishment Clause of the First Amendment. In Mergens, of course, the Supreme Court held that the Act did not violate the Constitution, at least not facially and not as applied to the school at issue in that case. 496 U.S. at 252, 110 S.Ct. at 2373 (O'Connor, J., plurality op.). East Brunswick asserts, however, that by virtue of New Jersey's law, which is more restrictive than the one in Mergens, a First Amendment barrier nonetheless exists to bar application of the Act's requirements to its high school. This argument is without merit.
 
 
 71
 In the district court, East Brunswick contended that a "panoply" of state constitutional provisions and statutes impose a duty on school districts to "exercise direction and control" over the routine operation of student organizations. Yet, the Act and the Establishment Clause forbid a school district from doing so in the case of a student religious group. 20 U.S.C. Secs. 4071(c)(2)-(3); Mergens, 496 U.S. at 251-53, 110 S.Ct. at 2372-73 (plurality op.). Because to abdicate these supervisory responsibilities with respect to the Bible Club would purportedly contravene New Jersey law, defendants argued that they were exempted from the Act by virtue of section 4071(d)(5), which allows a school district to refuse permission for "meetings that are otherwise unlawful." While this case was pending before the district court, however, the Court of Appeals for the Ninth Circuit issued its decision in Garnett v. Renton School Dist. No. 403, 987 F.2d 641 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993), in which the court held that the Equal Access Act preempts contrary state law. Id. at 646. Thereafter, both in its brief on appeal and at oral argument, East Brunswick acknowledged that the Act preempts the law of New Jersey.
 
 
 72
 East Brunswick instead relies on an alternative argument it made in the district court, that making an exception to its state law supervisory responsibilities solely for religious groups would somehow send an implicit message that it endorses religion, thus violating the Establishment Clause. Defendants allege this "message" would be sent when students see that the Bible Club is exempt from some of the restrictions imposed on other student groups. This argument too is fatally flawed.
 
 
 73
 It is well-established that New Jersey views extracurricular activities as an integral part of the educational experience. Mainland Regional Teachers Ass'n v. Board of Educ., 176 N.J.Super. 476, 423 A.2d 998, 1000 (1980).[14] This principle, however, arises from a series of labor disputes involving the conditions under which teachers could be assigned to supervise extracurricular activities. The New Jersey courts held that, because extracurricular activities were part of the educational process for students, the assignment of teachers to those activities was the prerogative of the school system. Id., 176 N.J.Super. at 482, 423 A.2d at 1001; see also Board of Educ. v. Asbury Park Educ. Ass'n, 145 N.J.Super. 495, 368 A.2d 396, 402 (1976), aff'd in part, dismissed in part, 155 N.J.Super. 76, 382 A.2d 392 (1977); Smith v. Board of Educ., 1968 School Law Dec. 62, 68 (N.J.Comm'r Educ.). We have found no decisional or other law supporting the proposition that, unless a school system actively directs and supervises a student activity, that activity violates New Jersey law.[15]
 
 
 74
 Defendants cite various New Jersey statutes that purportedly require more supervision than the Equal Access Act or the Establishment Clause allow. N.J.Stat.Ann. Sec. 18A:23-2 requires that school boards audit the books of student groups, but only those under the auspices of the board. Inasmuch as the Act forbids school sponsorship of a religious group, the Bible Club could not possibly be "under the auspices" of the East Brunswick Board of Education. Accordingly, this statute does not even apply to the Bible Club. Likewise, N.J.Stat.Ann. Sec. 18A:43-1 permits school districts to provide accident insurance for students engaged in extracurricular activities and field trips, but its provision is clearly discretionary and we fail to see how this section creates a supervisory duty, much less an Establishment Clause violation.[16]
 
 
 75
 East Brunswick also cites N.J.Stat.Ann. Secs. 18A:36-21, 23 for the proposition that school boards are responsible for administering, expending and accounting for all student activity funds. These sections, however, say absolutely nothing on that topic; rather, they authorize a school board to authorize field trips for which the students' parents must pay all or part of the costs unless a financial hardship exists. Nowhere do they even set down any mandatory requirements for approval or supervision of field trips. We find no supervisory requirement in this statute.
 
 
 76
 Defendants further point to a requirement of the Board of Education that all students maintain a 2.0 or better grade-point average to participate in extracurricular activities. Exempting marginal students from this requirement in the case of the Bible Club, they say, would lead to a perception that religion is somehow favored. We fail to see, however, why this requirement would have to be waived for Bible Club members. The requirement to maintain a certain academic average is a non-discriminatory rule of neutral applicability, no different from a dress code, a smoking policy or any other rule that promotes order, discipline and achievement in a high school. The Equal Access Act does not forbid discrimination between differently situated students, but only discrimination based on the religious or other content of the speech at their proposed meetings. 20 U.S.C. Sec. 4071(a).
 
 
 77
 Finally, East Brunswick argues that Article I, Section 3 of the New Jersey Constitution forbids state financial support for any "ministry." It is presumably asserting that hypothetically the costs it may incur from recognizing the Bible Club will cause a state constitutional violation. This argument, however, ignores Resnick v. East Brunswick Township Bd. of Educ., 77 N.J. 88, 389 A.2d 944, 951-52 (1978), in which the New Jersey Supreme Court held that off-hours use of school facilities by church groups did not offend the state constitution. While the Resnick court did say that religious groups must reimburse the school for any out-of-pocket costs directly incurred as a result of their meeting, that requirement is fully consistent with the Equal Access Act, which itself forbids the expenditure of "public funds beyond the incidental cost of providing the space for student-initiated meetings." 20 U.S.C. Sec. 4071(d)(3). There is thus no conflict between the state constitution and federal law.
 
 
 78
 It is clear, then, that there is simply no conflict between New Jersey law and the Equal Access Act. Thus, whether argued in terms of federal non-preemption or an Establishment Clause violation resulting from the effects of preemption, East Brunswick has presented no legitimate state law grounds excusing its failure to comply with the Act.[17]
 
 III.
 
 79
 The district court correctly found that the Equal Access Act applies to the East Brunswick school system and that defendants violated the Act by failing to recognize the Bible Club. Accordingly, we will affirm its judgment.
 
 
 
 [1]
 Because the Act disposed of the case in Pope's favor, the court did not rule on the constitutional issues
 
 
 [2]
 The district court granted a stay of its order pending the results of East Brunswick's motion in this court for a stay pending appeal. A motions panel of this court subsequently denied defendants' motion for stay
 
 
 [3]
 The district court failed to make an award of nominal damages to Pope. At the conclusion of the hearing, counsel for Pope asked the court whether it wished to award damages. The court replied that Pope "should submit an appropriate affidavit," a statement whose meaning is not entirely clear in the context of nominal damages. Although this omission would appear to deprive the district court's order of finality within the meaning of 28 U.S.C. Sec. 1291, the parties stipulated at oral argument before us that such damages would be liquidated in the sum of one dollar. Because that stipulation resolves all remaining merits issues below, we conclude that we have appellate jurisdiction to review the district court's decision
 
 
 [4]
 The fact that the Bible Club at East Brunswick High School was permitted to meet unofficially--while being denied the use of the public address system, bulletin boards and other privileges accorded to nonreligious groups--is legally irrelevant. The same situation presented itself in Mergens, in which the Court held that the defendant school district violated the Act by not affording equal access. Id. at 247, 110 S.Ct. at 2370
 
 
 [5]
 The amicus urges us to reject the legislative history under the doctrine of West Virginia Univ. Hospital, Inc. v. Casey, 499 U.S. 83, 98, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991). We cannot do so. Casey holds only that, where the language of the statute is clear and unambiguous on its face, resort to the legislative history is improper. As quoted above, however, the Mergens Court found sufficient ambiguity in the Act to consider its legislative history
 
 
 [6]
 We note in this context that defendants bear a heavy burden when they rely on legislative history. As we have stated, "[t]he relevant question is not whether a result inconsistent with the literal language is consistent with the legislative history, but rather whether it is compelled by that history." Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 912 (3d Cir.1990)
 
 
 [7]
 East Brunswick argues that these guidelines support its view that "Congress intended to extend the student-initiated forum found at collegiate levels (e.g., in Widmar ) to be the forum that triggers [Equal Access Act] application in the secondary schools." This is incorrect. In Mergens, the Court specifically noted that the Act did not import the Widmar definition of "limited public forum." 496 U.S. at 241-42, 110 S.Ct. at 2367-68
 
 
 [8]
 The district court also held that, because suggestions from students for extracurricular groups were accepted by East Brunswick even under Policy 6145, this case was indistinguishable from Mergens even if student initiation were required under the Act. We agree. In both this case and in Mergens, the school districts considered extracurricular activities to be an integral part of the educational experience and required all student groups to be approved by school officials. Nevertheless, the Mergens Court held that the Westside school system violated the Act. Defendants attempt to distinguish Mergens by pointing out that the approval process in East Brunswick is more stringent, requiring a recommendation from the superintendent, a review to ensure that the club is related to the curriculum and an approval by the School Board. In Mergens, on the other hand, defendant's policy was analogous to that of East Brunswick before the adoption of Policy 6145. We find this difference in degree of regulation unpersuasive. In both Mergens and this case, students were given a mechanism by which they could make their desires for new student organizations known to the school system. The mere fact that there may have been additional administrative steps in the approval process is simply not significant
 
 
 [9]
 Interact and Zonta, both mentioned in Mergens, are examples of other student service organizations
 
 
 [10]
 See, e.g., Judges 5:2-31 (poetry); Ruth (short story; Goethe calls it the most beautiful of idylls); Jonah (humor, mythology and fiction); Psalms and The Song of Solomon (music); The Pentateuch, Joshua, I and II Chronicles, Ezekiel and The Apocrypha (History, Geography, Archeology and Anthropology)
 
 
 [11]
 See, e.g., Psalms 82:3-4; Proverbs 14:21; Deuteronomy 15:7-11; Frank R. Jimenez, Beyond Mergens: Ensuring Equality of Student Religious Speech Under the Equal Access Act, 100 Yale L.J. 2149, 2157 (1991)
 
 
 [12]
 Query also whether one can understand, let alone appreciate, the art of such masters as DaVinci, Michelangelo, Rubens, Raphael, Tissot, and a host of lesser-known artists, or in literature the allusions of Milton, Dante, or Dickens, and the irreverent, christo-iconoclastic satire of Samuel Clemens, or in contemporary social-political studies, the moving speeches of slain civil rights leader Dr. Martin Luther King, without at least some knowledge of the Bible
 
 
 [13]
 Judge Becker does not join in the discussion contained in this paragraph, believing it unnecessary to the result
 
 
 [14]
 Counsel are admonished, when preparing briefs for this court, to comply with Third Circuit LAR 28.3, which requires that state court decisions be cited "to the West Reporter system whenever possible, with an identification of the state court."
 
 
 [15]
 East Brunswick has directed us to the "Thorough and Efficient" education statute, N.J.Stat.Ann. Sec. 18A:7A-1 et seq., as mandating the level of active sponsorship and supervision it argues is required. This statute contains fifty-two sections, yet defendants did not refer us to any specific language that supports their position, nor did our review of the statute reveal any such language
 
 
 [16]
 Equally puzzling is defendants' citation of N.J.Stat.Ann. Sec. 34:13A-23. This statute makes assignment of teachers to extracurricular activities the subject of collective bargaining, but appears to have no significance whatsoever to a school board's alleged duty to supervise student groups
 
 
 [17]
 As already discussed, we have found no New Jersey law requiring that all student groups have a faculty advisor or sponsor. To the extent that East Brunswick is arguing that a federally mandated exemption from board policy requiring such sponsorship causes an Establishment Clause violation, the Mergens Court rejected this argument, holding that the statutorily limited faculty participation in religious meetings mitigates any danger of perceived state endorsement of religion. 496 U.S. at 251, 110 S.Ct. at 2372 (plurality op.)