MAKAR, J.,
concurring with opinion.
I concur in the opinions of Judges Roberts and Osterhaus, and write separately to emphasize that Florida’s legal history on the right to keep and bear arms makes this a straightforward case. I also suggest that when panels ask the parties to address constitutional or other issues of statewide importance not raised in the briefing process, the Attorney General of the State of Florida should be notified so that she can choose to exercise her right to be heard on such matters.
I.
In Florida, the constitutional right of the people to keep and bear arms in defense of themselves is older than the State itself. The right dates back 175 years to the 1838 *983 Florida Constitution,[12] adopted by the Territory of Florida (formerly East Florida and West Florida), which was seeking admission into the Union at that time. Florida was admitted as the twenty-seventh State in 1845, and the constitutional right — with only a small gap[13] — has endured ever since.[14]
It is a personal, individual liberty, entitled to protection like other constitutional rights.[15] Like any civil right established in the state or federal constitutions, the legislative branch may choose to pass laws designed to facilítate its exercise or protect against its infringement, which Florida’s legislature has done repeatedly over the past fifty years on the specific topic at issue: safely-secured firearms in motor vehicles.[16]
As far back as 1965, the legislature made clear that the people have the right to travel in their vehicles with firearms that are secured in a way that renders them inaccessible for immediate use. Ch. 65-410, Laws of Fla.; see § 790.25(3)(i), Fla. Stat.[17] Throughout this law’s history, *984 the legislature has demanded that this right be liberally construed in favor of its exercise. § 790.25(4), Fla. Stat.[18] In 1982, the Legislature strengthened and reinforced this right, making clear that people have the right “to possess a concealed firearm or other weapon for self-defense or other lawful purposes within the interi- or of a private conveyance, without a license, if the firearm or other weapon is securely encased or is otherwise not readily accessible for immediate use.” Ch. 82-131, Laws of Fla. Almost thirty years ago, the Florida Supreme Court upheld this right in Alexander v. State, 477 So.2d 557, 558 (Fla.1985), concluding that an employee sitting in his parked car in the employer’s parking lot has a right to possess a zippered pouch containing a firearm.
Handgun safety on school and school district property was a major concern in 1992 when the legislature enacted laws criminalizing conduct involving the possession of firearms and other specified weapons on school property. Ch. 92-130, Laws of Fla. In doing so, however, the legislature explicitly recognized as a lawful right — one under section 790.25, entitled “Lawful ownership, possession, and use of firearms and other weapons” — to have a firearm safely-secured in a vehicle on school property. § 790.115(2)(a)(3), Fla. Stat.[19] The legislature made the judgment that a safely-secured firearm in a vehicle is permissible, even if that vehicle is parked in a lot or garage on school property. Because of greater sensitivities about K-12 district schools, the legislature carved out an exception: any of the sixty-seven “school districts” may adopt a contrary policy “for purposes of student and campus parking privileges” but schools — including universities — lack that authority. Id. The statute’s core provisions are unchanged over the last two decades.
The main purpose underlying these five decades of legislative protection of the right to a safely-secured firearm in a motor vehicle, and two decades of explicit protection of the right on school property, is the legislative judgment that persons desiring to exercise their right to keep and bear arms not be forced to leave their firearms at home when they travel by motor vehicle, sometimes through potentially dangerous neighborhoods or en route to engage in other lawful activities such as target shooting or hunting, as two examples. This purpose is highlighted in a recently enacted related law, section 790.251(4)(a), Florida Statutes, the “Preservation and Protection of the Right to Keep and Bear Arms in Motor Vehicles Act of 2008,” which strengthened existing legal protections for certain persons such as employees and customers who have se *985 cured firearms in their vehicles at private businesses.[20]
However one views the advisability of the constitutional right to keep and bear arms generally, or the statutes facilitating the manner in which the right is exercised, the entire history on the subject demonstrates that the legislature has specifically and repeatedly protected the right of the people to have safely-secured guns in their vehicles for purposes of self-defense and other lawful purposes. This history makes this an easy case.
With the backdrop of 175 years of constitutional protection for the right to keep and bear arms in self-defense, supplemented by fifty years of statutory protection of the specific right to have a secured firearm in one’s vehicle, the university’s policy — as laudable as it may be — directly conflicts with this legal history. As Judge Roberts explains, a university’s general powers to administer its affairs under article IX, section 7 of the Florida Constitution and related statutes, does not trump this legal history. Whatever can be said of the state constitutional and statutory powers of universities, the Florida Constitution specifies without qualification that the “manner of bearing arms may be regulated by law.” Art. I, § 8(a), Fla. Const. The use of the phrase “by law” places this authority exclusively in the legislative branch.[21] Placing limitations on the right to bear arms is a quintessentially legislative function[22] under the Florida Constitution, which does not textually limit the right to bear arms to a particular place, such as in defense of the home only[23] Rather, it speaks only in *986 terms of the “right of the people to keep and bear arms in defense of themselves” without limiting where that self-defense might occur.[24] Exercising its exclusive constitutional authority, the legislature has made the policy judgment that having secured weapons in motor vehicles on school property is a protected right. A university — which, unlike the legislature, lacks any specific constitutional authority to regulate on this topic — cannot override that judgment. This lack of constitutional authority empowering the university to regulate the manner of bearing arms is decisive.[25] Even if it were not, to the extent the university believes its statutory authority should prevail, its general authority under section 1001.706(7)(b), Florida Statutes, is subordinate to the more specific statutes allowing safely-secured guns in vehicles.[26] As Judge Osterhaus explains, universities lack the power to sweep aside the longstanding statutory protection of the right to have secured firearms in vehicles under the pretense that they are “school districts” implementing “noncriminal” policies or regulations. In addition, reading the general language of article IX, section 7 of the Florida Constitution broadly would effectively create a fourth branch of government, one with “edu-slative” powers that trump those of the legislative branch; nothing in the language of the amendment or its ballot title or summary[27] suggested such a dramatic alteration to the fundamental three-branch structure of the state constitution.
Finally, merely because this case involves a policy that regulates student conduct does not grant the university immuni *987 ty from the state and federal constitutions or statutory rights. It is worth noting that if a university, by administrative policy, could override a long-standing right of the people, including adult students, then seemingly little would stand in the way of a university policy that conflicted with, for example, environmental, health, or public safety laws or perhaps other constitution freedoms or statutory rights. If universities can regulate away a Second Amendment right, why not a First Amendment one? Or one protected by the Fourth or Fifth Amendment? This point is rhetorical, but nonetheless meaningful because campus authority unchecked can go astray of constitutional norms in many ways. See, e.g., Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (exclusionary policy prohibiting student religious group from using university facilities open to other groups violates principle of content neutrality); Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (temporary suspension from school without notice and chance to rebut charges violates due process); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (prohibition on wearing non-disruptive armband unconstitutional). From these substantive points, the next section shifts to a procedural one.
II.
Appellate judges are a curious lot; they tend to ask questions litigants have not answered and seek answers to questions litigants have not asked. From time to time, an appellate panel may decide that an important legal issue is present in a case that the parties have either not fully developed or perhaps not raised directly at all. Taking the next step, the panel asks the parties to be prepared to address or brief the court on the issue identified.[28]
That is what happened here. On March 12, 2013, the panel sua sponte ordered that the counsel of record “shall be prepared to address the following issues at oral argument[ ]”
1. Does a state university have independent authority under Article IX, section 7 of the Florida Constitution as interpreted in Graham v. Haridopolos, 108 So.3d 597 (Fla.2013) and NAACP, Inc. v. Florida Board of Regents, 876 So.2d 636 (Fla. 1st DCA 2004) to adopt a noncriminal policy or regulation concerning the possession of firearms on campus, irrespective of any right it may have under section 790.115(2)(a)(3), Florida Statutes, to waive the exception that would allow a student to possess a firearm in a vehicle?
2. Does the University of North Florida qualify as a “local or state govern *988 ment” such that its policies and regulations could be preempted by section 790.33, Florida Statutes?
3. Does the provision of the student handbook at issue in this case qualify as an “ordinance,” “rule” or “administrative regulation” within the meaning of section 790.33, Florida Statutes?
If, after the oral argument, it appears that any of these issues may have an effect on the disposition of the case, the parties will be given an opportunity to submit supplemental briefs.
Neither in the trial court nor on appeal had the university sought to rely upon its “independent authority” under the Florida Constitution for its policy. Oral argument was held on March 19, 2013. Three days later, the panel ordered that the “parties may file supplemental briefs directed to the issues identified by the court in its order dated March 12, 2013.” In both orders, the panel notified only the counsel of record for the two parties involved, i.e., the plaintiffs and the university. No notice was provided to any official in state government.
The practice of an appellate panel asking that counsel be prepared to address specific issues at oral argument, or to file supplemental briefs on designated topics, is an accepted and useful one. It is infrequently invoked, perhaps because it imposes expense on the parties and potentially delays the process. But it provides a twofold benefit: litigants get a preview of what judges are thinking, and judges get direction from litigants on the issues identified.[29]
*989 Notice to only the parties’ counsel makes sense in the run-of-the-mill case, one not having far-reaching implications or addressing issues of limited scope. But when the legal issues raised are weighty and affect constitutional rights, the structure of government, or statutory interpretation matters of statewide importance, as examples, it behooves the panel — and promotes due process and judicial decision-making — to include in the notification process, at a minimum, the state’s chief legal officer: Florida’s Attorney General, who is a critical stakeholder in defending the validity and constitutionality of the state’s laws. As this Court recently said:
The Attorney General is in many ways no ordinary litigant. She has important and far-ranging responsibilities, including the “power to institute litigation on [her or] his own initiative.” State ex rel. Shevin v. Exxon Corp., 526 F.2d 266, 271 (5th Cir.1976). Section 16.01(4), Florida Statutes (2011), provides that the Attorney General “[s]hall appear in and attend to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of this state.” Under this statute, as at common law, the Attorney General has broad authority to litigate matters in the public interest:
[I]t is the inescapable historic duty of the Attorney General, as the chief state legal officer, to institute, defend or intervene in, any litigation or quasi-judicial administrative proceeding which he determines in his sound official discretion involves a legal matter of compelling public interest ...
The courts of this state have long recognized this advocacy authority, and litigation duty of the Attorney General. It derives from the common law and in only rare instances has the Legislature otherwise provided, [citations omitted]
State ex rel. Shevin v. Yarborough, 257 So.2d 891, 894-95 (Fla.1972) (Ervin, J., specially concurring). We recognize that the “office of the Attorney-General is a public trust ... [and that s]he has been endowed with a large discretion ... in ... matters of public concern,” State v. Gleason, 12 Fla. 190 (Fla.1868), and acknowledge and affirm the Attorney General’s “discretion to litigate, or intervene in, legal matters deemed by him [or her] to involve the public interest ... and [that] his [or her] standing ... can not be challenged or adjudicated.” Id. at 895 (Ervin, J., specially concurring). See also Thompson v. Wainwright, 714 F.2d 1495, 1500-01 (11th Cir.1983).
Bondi v. Tucker, 93 So.3d 1106, 1109 (Fla. 1st DCA 2012).
In Bondi, this Court held that despite the Attorney General’s broad and unquestioned authority to intervene as a party in any matter in which the State’s interest are implicated, she must still seek formal leave to do so to acquire standing. Notably, this issue was not raised by the parties. Pertinent here, the panel in Bondi sua sponte notified counsel as follows:
At oral argument scheduled for June 27, 2012, the parties should be prepared to address the questions of whether the matter is moot or inevitably will be moot before a decision can be rendered; whether the Attorney General has *990 standing; and whether a nonparty in the proceeding below may perfect an appeal and confer jurisdiction on this court.
Order, Bondi v. fucker, 98 So.Sd 1106 (Fla. 1st DCA 2012) (emphasis added). Notification in Bondi — obviously—included notification to the Attorney General, who was as a named party. In addition, the issues raised went to the Court’s jurisdiction, which is a matter that can be raised at any time. In contrast, the supplemental issues raised here do not go to jurisdiction; they were neither raised nor briefed below and, ordinarily, would be waived on appeal.
Which returns us to the main point: as a matter of inter-branch comity it ought to be the rule that whenever a panel notifies counsel in an appeal that an issue of constitutional concern or statewide importance has arisen, particularly when the parties have not raised the issue themselves, the Attorney General must also be notified. This did not occur in this case, the panel only notifying the parties; nor has the en banc court done so. The point is not that an appellate panel ought to refrain from seeking guidance on constitutional or similar issues; they should do so if deemed important to resolution of the appeal as the panel in this case believed.
Rather, the point is that notification to the Attorney General on such important legal issues should be a matter of course, not a matter of chance. I speak with some experience, having served two Attorneys General in the Office of the Solicitor General [30] over five years. During that time, it was a ceaseless worry — and a constant reality — that constitutional issues important to state government were being litigated throughout the state and federal courts in Florida (and sometimes beyond) without our office being aware of them until it was too late to intervene or otherwise be heard on the matter. Most often, it was the lack of compliance below with section 86.091, Florida Statutes, which requires in declaratory judgment actions that if a “statute, charter, ordinance, or franchise is alleged to be unconstitutional, the Attorney General or the state attorney of the judicial circuit in which the action is pending shall be served with a copy of the complaint and be entitled to be heard.”[31] But sometimes it was the judicial branch’s failure to notify executive branch stakeholders of questions raised similar to those in this proceeding.
One could argue that if an issue is important enough, a party in the litigation would contact and request that the Office of the Attorney General seek intervention as a party or appear as an amicus; and, indeed, that happens with some regularity. *991 A far better approach, one eliminating the element of serendipity, is simply to provide notice to the Attorney General as a matter of course so that she can decide whether to weigh in on the issues presented. This protocol could be followed as a matter of informal judicial policy, pursuant to an internal operating procedure or an official court rule, or via a legislative amendment to the Laws of Florida. However it is to be accomplished, notification to the Attorney General is important in cases of. constitutional and statewide importance and is a courtesy that strengthens inter-branch relations.

. Article I, section 21 of the 1838 Constitution stated: "That the free white men of this State shall have the right to keep and to bear arms, for their common defense." The 1861 Constitution retained this language; the racial and gender restrictions were eliminated in the 1868 Constitution.

. When enacted, the 1865 Constitution omitted the right, but it was soon added back to the 1868 Constitution, which stated: "The people shall have the right to bear arms in defense of themselves and of the lawful authority of the State.” Art. I, § 22, Fla. Const. (1868).

. See Art. I, § 8, Fla. Const. (1968) ("The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the state shall not be infringed, except that the manner of bearing arms may be regulated by law.”); Art. I, § 20, Fla. Const. (1885) ("The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne.”).

. Unlike the Second Amendment, the constitutional right of people to keep and bear arms in Florida is one that explicitly includes self-defense. Id. The national debate about whether the Second Amendment establishes such a personal right in defense of oneself, begun in earnest in the 1980s, pointed out that advocates of other civil liberties in the Bill of Rights ignored the Second Amendment, relegating it to marginalia in texts and treatises, if it was mentioned at all. See, e.g., Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 640 (1989) (noting that major texts of the time "marginalize the Amendment by relegating it to footnotes; it becomes what a deconstructionist might call a ‘supplement’ to the ostensibly 'real' Constitution that is privileged by discussion in the text.”).

. This case is limited to only this topic; it is not about "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” Dist. of Columbia v. Heller, 554 U.S. 570, 626-27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Firearms in school buildings — or on school properties — are generally not allowed (recognizing exceptions for vehicles, firearm training classes, and career centers with firearms training ranges) § 790.115(2)(a), Fla. Stat. (2013); see also § 790.06(12)(a) (disallowing weapons of concealed permit holders at public school meetings, school or college events, or in elementary or secondary school facilities or buildings).

. Chapter 65-410 created section 790.25, whose subsection three created fourteen categories of "Exceptions” to the general prohibition against carrying concealed weapons without a permit, including an exception for “(Z) Any person traveling by private conveyance when the weapon is securely encased, or in a public conveyance when the weapon is securely encased and not in persons [sic] manual possession.” Other than a grammatical change, the language of subsection 3(1) has remained unchanged.

. Subsection 790.25(4), also created by Chapter 65-410, stated, and still states, as follows:
(4) Construction. — This act shall be liberally construed to carry out the declaration of policy herein and in favor of the constitutional right to keep and bear arms for lawful purposes. This act is supplemental and additional to existing rights to bear arms now guaranteed by law and decisions of the courts of Florida, and nothing herein shall impair or diminish any of such rights. This act shall supersede any law, ordinance, or regulation in conflict herewith.
§ 790.25(4), Fla. Stat. (2013).

. Section 790.115(2)(a)(3) states as one of the exceptions to the prohibition of weapons on school property or at school sponsored events that "a person may carry a firearm: ... 3. In a vehicle pursuant to s.790.25(5); except that school districts may adopt written and published policies that waive the exception in this subparagraph for purposes of student and campus parking privileges.” It also states that: “For the purposes of this section, 'school' means any preschool, elementary school, middle school, junior high school, secondary school, career center, or postsecond-ary school, whether public or nonpublic."

. The Act was subject to a broad constitutional challenge, including the claim that the State lacked authority to impose the Acts restrictions, but the only provision held impermissible was a portion of the Act distinguishing between businesses with/without an employee with a concealed firearms permit. Fla. Retail Fed’n, Inc. v. Att'y Gen. of Fla., 576 F.Supp.2d 1281 (N.D.Fla.2008), entering judgment, 576 F.Supp.2d 1301 (N.D.Fla.2008). The court enjoined only a part of the Act to the extent it made this distinction, leaving the remainder in place, giving both sides reason to declare victory. The court, however, made no holding that limited the legislature’s fundamental power to enact laws protecting the rights of those who exercise the right keep/bear arms. Indeed, its ruling says nothing to undermine the authority of the legislature to regulate the manner of bearing arms on state-owned property, which is at issue here.

. See Chiles v. Children A, B, C, D, E, and F, 589 So.2d 260, 267 (Fla.1991) (interpreting phrase "made by law” in Florida constitution to mean only the legislative branch because it alone has the lower to make "law"); Grapeland Heights Civic Ass’n v. City of Miami, 267 So.2d 321, 324 (Fla.1972) (use of the word "law” in state constitution "means an enactment by the State Legislature” not any other political bodies.).

. As Justice Scalia noted in Heller, 554 U.S. at 626-27, 128 S.Ct. 2783, laws that forbid "the carrying of firearms in sensitive places such as schools and government buildings” are presumptively permissible; but such laws are the province of the legislature to enact, not via unauthorized university policies.

. Whether the right is tethered to the home, or extends beyond, is addressed in recent cases from federal and state courts. Compare Moore v. Madigan, 702 F.3d 933, 942 (7th Cir.2012) (explaining that the Second Amendment includes right to possess and use firearm outside the home for self-defense; invalidating overbroad statute criminalizing carrying of firearm other than at one’s home or place of business, or on one’s own land) ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.”); and People v. Aguilar, 2013 IL 112116 (2013), (adopting Moore), with Drake v. Filko, 724 F.3d 426 (3d Cir.2013) (law requiring applicant show a "justifiable need” to carry handgun for self-defense in public is a “presumptively lawful” and "longstanding” regulation that does not burden Second Amendment rights; noting, but not holding, that "Second Amendment's individual right to bear arms may have some application beyond the home.”); and Woollard *986 v. Gallagher, 712 F.3d 865, 876 (4th Cir.2013) (assuming that "right exists outside the home” but upholding law requiring applicants show "good and substantial reason” for obtaining handgun permit under intermediate scrutiny test).

. The United States Supreme Court has given meaning to the phrase “bear arms,” noting that "[a]t the time of the founding, as now, to ‘bear’ meant to 'carry.' ... When used with ‘arms,’ however, the term has a meaning that refers to carrying for a particular purpose—confrontation.” Heller, 554 U.S. at 584, 128 S.Ct. 2783.

. Much like the legislature's exclusive appropriation power in the Florida Constitution, the legislature's exclusive authority to regulate the manner of bearing arms in article I, section 8, negates any such authority within the university system. Graham v. Haridopolos, 108 So.3d 597, 605 (Fla.2013). Moreover, this exclusive legislative power is of a "wholly different nature” than "the executive and administrative functions delineated in the constitutional provision and therefore is not included in the meaning of 'operate, regulate, control, and be fully responsible for the management of the whole university system.’ ” Id.

. Many cases hold similarly. See, e.g., Adams v. Culver 111 So.2d 665, 667 (Fla.1959) ("It is a well settled rule of statutory construction ... that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms.”). Only when there is a "hopeless” inconsistency between two statutes — which is not the case here — does a more recently enacted one prevail. State v. Parsons, 569 So.2d 437, 438 (Fla.1990).

. The Florida Supreme Court concluded that because "the proposed amendment does not substantially affect or alter any provision in the state constitution, the ballot summary is not defective in this regard.” In re Advisory Op. to Att'y. Gen. ex rel. Local Trustees, 819 So.2d 725, 732 (Fla.2002). As in Haridopo-los, the ballot title and summary nowhere indicate that voters or framers intended that constitutional authority to regulate the manner of bearing arms be shifted from or shared by the legislature. 108 So.3d at 605 ("Nowhere in the ballot title or ballot summary does it indicate that the voters or framers intended for the Board of Governors to have authority over the setting of and appropriating for the expenditure óf tuition and fees.”).

. Other options exist. As one author notes:
What should happen when an appellate court looks at the briefs and arguments presented by the parties and feels that the issue has not been framed correctly? When appellate judges believe that a potentially dispositive issue was missed by the parties, they have several options: (1) they can ignore the issue; (2) they can spot the issue in their opinion, but treat it as not properly raised or waived; (3) they can spot the issue and remand it for resolution in the first instance in the trial court; (4) they can ask the parties for supplemental briefs before deciding the issue; (5) they can decide the issue without briefs; (6) they can spot the issue in the opinion, and write dicta.
Barry A. Miller, Sua Sponte Appellate Rulings: When Courts Deprive Litigants Of An Opportunity To Be Heard, 39 San Diego L. Rev. 1253, 1256 (Fall 2002) (footnote omitted). Another author notes that "possible approaches to this question range widely from a strict prohibition against raising outside arguments or other considerations to an absolute duty to find the one best theory on which to decide the case.” Sarah M. R. Cravens, Involved Appellate Judging, 88 Marq. L. Rev. 251, 254 (Fall 2004).

. If a court raises new issues not presented by an appellant, the practice can run counter to the fundamental principle that an issue is waived if not raised on appeal. Differing views exist, though the following are general guidelines:
Generally, supplemental briefs may be filed pursuant to the provisions of the relevant appellate rules or by the consent of the court, subject to the restriction that an issue or claim may not be asserted for the first time in a supplemental brief. However, when the claim implicates fundamental constitutional rights, the court may consider a claim that was not included in the original brief and is raised in a supplemental brief. Courts may require that supplemental briefs be filed for issues not raised by the parties or when there remains confusion or doubt concerning an issue. Whether courts allow supplemental briefs to be filed depends in part on the timing of the request in relation to the status of the appeal.
5 Am. Jur. 2d Appellate Review § 519 (2013) (footnotes omitted). In the context of Anders briefs, the Florida Supreme Court has broadly said that “an appellate court can order supplemental briefs in any case before it, regardless of the type of brief originally filed.” In re Order of First Dist. Ct. of Appeal Regarding Br. Filed in Forrester v. State, 556 So.2d 1114, 1117 (Fla.1990) ("We approve the district court’s requiring supplemental briefs as being within the inherent powers of the court.”). In a non-Anders context, Judge Cope, writing for himself, noted that it “appears that an appellate court has the power to order supplemental briefing and to consider the briefs when filed. This amounts to an exception to the waiver rule” that would otherwise foreclose review of new issues raised by the court absent fundamental error. R & B Holding Co., Inc. v. Christopher Adver. Grp., Inc., 994 So.2d 329, 336-37 (Fla. 3d DCA 2008) (Cope, J., concurring in part, dissenting in part) ("court has the discretion to order supplemental briefs on an issue raised by the court sua sponte.”). The Eleventh Circuit, for example, has a strict standard:
Parties must submit all issues on appeal in their initial briefs. When new authority arises after a brief is filed, this circuit permits parties to submit supplemental authority on "intervening decisions or new developments” regarding issues already properly raised in the initial briefs. Also, parties can seek permission of the court to file supplemental briefs on this new authority. But parties cannot properly raise new issues at supplemental briefing, even if the issues arise based on the intervening decisions or new developments cited in the supplemental authority.
United States v. Nealy, 232 F.3d 825, 830 (11th Cir.2000) (internal citations omitted). *989 See also Miller, supra note 17 at 1307-08 (contrasting adversary process model, which focuses narrowly only on issues raised by parties and applies waiver rule rotely, with equity model, which focuses more broadly on achieving justice — or avoiding injustice — and applies waiver rule less strictly).

. The Office of the Solicitor General routinely files amicus briefs and intervenes in cases of statewide and constitutional importance on behalf of the Attorney General. See Rachel E. Nordby, Florida’s Office of the Solicitor General: The First Ten Years, 37 Fla. St. U. L. Rev. 219, 222 (2009) (OSG "is based on the theory that a unit within the Attorney General’s Office should be devoted solely to appellate work involving the state’s interests. By selecting cases to work on through careful analysis of the interests and legal questions at issue, the OSG keeps its caseload manageable and provides devoted attention to cases that significantly implicate Florida’s interests.”).

. See also Fla. R. Civ. P. 1.071 (requiring that “a party that files a pleading, written motion, or other paper drawing into question the constitutionality of a state statute ... must promptly (a) file a notice of constitutional question stating the question and identifying the paper that raises it; and (b) serve the notice and the pleading, written motion, or other paper drawing into question the constitutionality of a state statute ... on the Attorney General ... by either certified or registered mail.” (emphasis added).